WEISBART & CO., a Colorado Corporation, Plaintiff-Appellant,

v.

FIRST NATIONAL BANK OF DALHART, TEXAS,
Defendants-Appellees.

No. 76–1860.

United States Court of Appeals,
Fifth Circuit.

Feb. 24, 1978.

Otis C. Shearer, Booker, Tex., James G. Baker, Perryton, Tex., for plaintiff-appellant.

Davis & David, John L. David, Dalhart, Tex., Earnest L. Langley, Hereford, Tex., for defendants-appellees.

Don L. Patterson, Amarillo, Tex., for Al Gallo.

Before INGRAHAM, GEE and TJOFLAT, Circuit Judges.

INGRAHAM, Circuit Judge:

This case arises out of a three-party transaction involving a seller of cattle, the bank which financed his herd, and the purchaser of the cattle. Following the execution of a contract for sale but prior to delivery of the livestock to the purchaser, the bank foreclosed upon its security interest and repossessed the cattle. This suit by the purchaser against the bank to recover the value of the cattle presents an issue of first impression under the Uniform Commerce Code as adopted in Texas [1]—does the consent of the bank to a contract between a seller and purchaser in and of itself subordinate the bank's security interest to the contract of sale? We hold that it does not and thereby affirm the trial court's judgment for the bank.

The seller, Al Gallo, had a permanent arrangement for a continuing line of credit from First National Bank of Dalhart to cover the expenses of buying, fattening and subsequently reselling cattle. In return for the borrowed money, the bank would retain a security interest in the cattle. Gallo would subsequently pay off his loan from the proceeds of the sale of the cattle.

The contract of sale involved in this suit was executed on October 30, 1971, and obligated Gallo to deliver thirty five hundred heifers to Weisbart between May 1 and October 1, 1972. At that time Gallo did not own the cattle which Weisbart had agreed to buy, but began stocking his herd shortly after the contract was signed. With each purchase by Gallo, the bank loaned money to cover the cost of the livestock, as well as the expenses necessary to raise the cattle. The bank retained a properly perfected security interest in the livestock.

In the months following execution of the contract, the price of cattle began to rise. Gallo found it increasingly difficult to purchase the required number of cattle to fill his contract at a price which would also enable him to maintain them and then deliver them to Weisbart without suffering substantial loss. To add to his predicament, Gallo lost many head of cattle during two severe winters. Because of these difficulties, Gallo and Weisbart agreed in May of 1972 to extend the date of performance of the contract. On October 3–5, eight hundred and eight heifers were delivered in accordance with the first extension, but it became necessary to enter into a second extension agreement as to the remaining twenty seven hundred head of cattle. Dated October 4, 1972, the extension provided for the delivery of fourteen hundred head on or before April 1, 1973, and the remaining thirteen hundred head on or before October 1, 1973. It is undisputed that the bank participated in the negotiations leading up to the extensions. Furthermore, the jury found that the bank consented to and acquiesced in the extensions of the contract.[2]

In May and June of 1973, the bank foreclosed upon seventeen hundred and sixty-three head of cattle in Gallo's possession after coming to the realization that the proceeds from the sale of the cattle under the contract would be insufficient to pay

---

1. Tex.Bus. & Com. Code Ann. (1968). Hereinafter, all citations and references to the UCC are to the Code, as adopted in Texas.

2. SPECIAL ISSUE NO. ONE
   (a) Do you find from a preponderance of the evidence that the First National Bank of Dalhart consented to and acquiesced in the renewed and extended contract for sale of cattle between Al Gallo and Weisbart & Co.?
   Answer: *Yes*

off the loan. Weisbart purchased the seventeen hundred and sixty-three head of cattle from the bank. Then, invoking the court's diversity jurisdiction, Weisbart sued the bank in federal district court for the difference between the price it paid the bank for the cattle and the original contract price. Judgment was rendered for the bank upon jury issues, after which Weisbart appealed.

Weisbart pursued its action under a theory of contractual interference, alleging that the bank "willfully, intentionally and without legal justification or excuse caused or brought about a breach of the contract by Gallo." The issue of waiver forms the linchpin of Weisbart's argument, for if the bank did not waive its security interest, its repossession of the livestock was fully justified.

In order to establish waiver by the bank, the trial court required a showing of intent. This requirement was reflected in jury issue 1(b):

> Do you find from a preponderance of the evidence that by consenting and acquiescing in the [renewed and extended contract for sale between Al Gallo and Weisbart & Co.] that the bank intended that its mortgage and lien on the cattle would be subject to and inferior to Weisbart's contract to buy the cattle?
>
> ANSWER: It did not so intend.

■ Weisbart contests the submission of this issue on the ground that it is superfluous. The bulwark of Weisbart's position lies in § 9.306 of the UCC:

> (b) Except where this Article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.

Tex.Bus. & Com. Code Ann. § 9.306(b) (1968). Weisbart argues that by consenting to or acquiescing in the contract extensions, the bank authorized the disposition of its collateral, thus subordinating its security interest to Weisbart's contract.[3]

The threshold inquiry in this case is whether or not there was a "sale, exchange, or other disposition," so as to trigger the operation of § 9.306(b). *See International Harvester Credit Corp. v. Associates Financial Services Co.,* 133 Ga.App. 488, 489, 211 S.E.2d 430, 433–34 (1974). For the purposes of Article 9, § 9.105 adopts the definition of sale set out in § 2.106. This section defines a "sale" as "the passing of title from the seller to the buyer for a price." Tex.Bus. & Com. Code Ann. § 2.106 (1968); *Allen v. Ortho Pharmaceutical Corp.,* 387 F.Supp. 364, 367 (S.D.Tex.1974); *First National Bank v. Joseph T. Ryerson & Son, Inc.,* 487 S.W.2d 377, 381 (Tex.Civ.App.—Texarkana, 1972, writ ref'd n.r.e.). Section 2.401 specifies when title passes:

> (b) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods . . . ..
>
> .     .     .     .     .
>
> (2) if the contract requires delivery at destination, title passes on tender there.

Tex.Bus. & Com. Code Ann. § 2.401 (1968).

■ The contracts in the instant case did not state when title was to pass. Title would therefore pass in accordance with § 2.401. Since the contract calls for delivery at Weisbart's ranch if it so desires, title could not pass until this delivery was effected. *See Gehl Bros. Mfg. Co. v. Price's Producers, Inc.,* 319 S.W.2d 955, 958 (Tex.Civ. App.—El Paso, 1958, no writ).

---

**3.** This case does not implicate § 9.307 which permits the buyer in the ordinary course of business to take free of a security interest created by his seller. By its express terms § 9.307 does not apply to "a person buying farm products from a person engaged in farming operations." Tex.Bus. & Com. Code Ann. § 9.307(a) (1968). There can be no dispute that the cattle Weisbart contracted to buy were "farm products" and that Gallo was engaged in "farming operations." See Tex.Bus. & Com. Code Ann. § 9.109 (1968).

■ Neither was there an "exchange" of the livestock. Because the UCC does not define this term, we are relegated by § 1.103 [4] to the general principles of law and equity for its definition. Under Texas law, the difference between a sale and exchange is purely technical. An exchange occurs when "one party passes his property to another and in turn receives from the latter his property without having an agreed value placed on [either]." *Griswold v. Tucker,* 216 S.W.2d 276, 278 (Tex.Civ. App.—Ft. Worth, 1948, no writ). This type of transaction is to be distinguished from a sale where the property of each is transferred at an agreed value. *Id.* Significantly, an exchange requires at least a transfer of goods like that required for sale.[5] The contract in the instant case therefore does not constitute an "exchange."

■ The UCC likewise does not define "other disposition." The meaning of this term, however, may be distilled by applying the canon of statutory construction known as *ejusdem generis.*[6] Employment of the doctrine mandates that "other disposition" refer to a transaction of the same general type as a sale or exchange. Therefore, though "other disposition" cannot technically be characterized as a sale or exchange, at the minimum it must meet the threshold test of these two transactions by effecting a transfer of property. *See Barnard v. Bar-*

*nard,* 91 Ga.App. 502, 502–503, 86 S.E.2d 533, 536 (1955) (holding that since the word "sell" means to "divest one's self of all rights and interest in a thing sold," the doctrine of *ejusdem generis* compels that "exchange" and "dispose" also carry that connotation).

■ Thus the language of § 9.306 compels us to find that Weisbart's contract of sale did not constitute a "sale, exchange or other disposition." This conclusion accords with the policy sought to be furthered by the drafters of this section. Following acquiescence in and sale of the collateral, the farm products lender stands on the same footing as the inventory financier.[7] Neither has a continuing security interest in the collateral. §§ 9.306(b), 9.307(a). Each, however, retains a threshold of protection, because his security interest attaches to the proceeds of the sale. § 9.306(a) & Comment 2(a).

To hold that there was a "sale, exchange, or other disposition" for the purpose of applying § 9.306 would be to emasculate the protection that the UCC grants the bank. Because Weisbart had not received the sale price of the cattle, there were no proceeds (excluding the down payment) to which the bank's security interest could attach. *See In re Kittyhawk Television Corp.,* 383 F.Supp. 691, 693 (S.D.Ohio, 1974) (finding

---

**4.** Section 1.103 provides:

Unless displaced by the particular provisions of this [title], the principles of law and equity, including the law merchant and the law relative to capacity to contract, principal and agent, estoppel, fraud, misrepresentation, duress, coercion, mistake, bankruptcy, or other validating or invalidating cause shall supplement its provisions.

**5.** For the purposes of § 1031 of the Internal Revenue Code, which allows non-recognition of a gain from certain *exchanges,* 26 U.S.C. § 1031 (1967), the boundary between a sale and exchange is delineated in a different manner. An exchange is a transfer of property between owners, while a sale is the receipt of cash for the property. *Carlton v. United States,* 385 F.2d 238, 242 (5th Cir. 1967). Though this definition strays from the Texas definition, it accords with our conclusion that a transfer of the property is necessary to effect an exchange.

**6.** This doctrine counsels that general words following an enumeration of particular or specific items should be construed to fall into the same class as those items specifically named. *Goldring v. Goldring,* 523 S.W.2d 749, 757 (Tex.Civ. App.—Ft. Worth, 1975, writ ref'd n.r.e.). Thus, as this court has said before, a court should "construe the broad in light of the narrow, in a *common-sense recognition that general and specific words, when present together, are associated with and take color from each other." United States v. Insco,* 496 F.2d 204, 206 (5th Cir. 1974).

**7.** The drafters of the UCC have smiled more favorably upon the farm products lender than they have upon the inventory financier. Unlike inventory, farm products carry their security interest into the hands of the purchaser, unless the lender has acquiesced in the sale. See Miller, *Farm Collateral Under the UCC: "Those are Some Mighty Tall Silos, Ain't They Fella?* 20 S.Dak.L.Rev. 514, 535–36 (1974).

stock received in exchange for assets to be proceeds and thereby rejecting claim that there were no proceeds and hence no sale). We therefore hold that the contract of sale between Gallo and Weisbart does not spark the operation of § 9.306.[8]

 Our conclusion that the contract of sale does not fall within the provisions of § 9.306 does not preclude a finding that the bank intentionally waived its security interest. 2 G. Gilmore, Secured Interests in Personal Property 715 (1965). Because the UCC does not define the parameters of waiver, § 1.103 again directs us to the principles of the common law. See footnote 4, *supra.*

 In general, waiver occurs when one in possession of any right, whether arising out of law or contract, with full knowledge of the material facts, performs an act which is inconsistent with the right or his intention to rely upon the right. *Harris, Upham & Co. v. Ballantyne,* 538 S.W.2d 153, 157 (Tex.Civ.App.—Dallas, 1976, no writ); *Ford v. Culbertson,* 158 Tex. 124, 138–39, 308 S.W.2d 855, 865 (1958). A fairly recent decision scores the importance of intent in waiver:

> Intention is a prime factor in determining the question of waiver. The acts, words or conduct relied upon to establish intention must be such as to manifest an unequivocal intention to no longer assert the right. Waiver by implication will be applied only to prevent fraud or inequitable consequences.

*Athens Commission Co. v. Lufkin Livestock Exchange, Inc.,* 439 S.W.2d 427, 430 (Tex.

Civ.App.—Beaumont, 1969, writ ref'd n.r. e.). *See also Ford v. Culbertson,* 158 Tex. at 139, 308 S.W.2d at 865.

 It was this requirement of intent that the trial court sought to satisfy when it submitted jury issue 1(b), inquiring whether "the bank intended that its mortgage and lien on the cattle would be subject to and inferior to Weisbart's contract to buy cattle." This issue was not only justified, but was essential to establish waiver under Texas law.

The judgment of the trial court is AFFIRMED.[9]

---

8. Because of our conclusion that the contract for sale is not governed by § 9.306, the cases cited by Weisbart that were decided under this section are inapplicable. In each of these cases, a sale had been completed and the purchaser had taken possession of the collateral. The bank had therefore instituted the suit under a theory of conversion. In the present case, since the bank had possession of the collateral, the purchaser was forced to bring suit. *See, e. g., Hedrick Savings Bank v. Myers,* 229 N.W.2d 252 (Iowa 1975); *Garden City Production Credit Ass'n v. Lannan,* 186 Neb. 668, 186 N.W.2d 99 (1971); *Clovis Nation-*

al Bank v. Thomas, 77 N.M. 554, 425 P.2d 726 (1967).

Furthermore, we need not resolve the issue that each of these cases addresses—whether or not consent and acquiescence in the execution of the contract for sale is of itself sufficient to constitute "authorization" and thus terminate the lender's security interest under the provisions of § 9.306. *See, e. g., id.*

9. Because our disposition of this case upholds the district court's judgment of no liability, we need not consider Weisbart's contention that the trial court's submission of the damage issue was improper.