In re Arville Calvin NIVENS and Sherwyn Lynn Nivens, a/k/a Sherwyn Fyfee and Sherwyn Fyfee Shurbet Nivens, d/b/a Nivens and Nivens, a partnership,

In re Danny Calvin NIVENS, d/b/a Nivens and Nivens, a partnership, Debtors.

FIRST STATE BANK OF ABERNATHY, Plaintiff,

v.

Floyd HOLDER, Trustee, Defendant,

v.

UNITED STATES SMALL BUSINESS ADMINISTRATION, Intervenor.

Bankruptcy Nos. 582–00044, 582–00045. Adv. No. 582–0047.

United States Bankruptcy Court, N. D. Texas, Lubbock Division.

July 30, 1982.

288

Mackey Hancock, Lubbock, Tex., for debtors.

Walter J. Taylor, Lubbock, Tex., for plaintiff.

Floyd Holder, Lubbock, Tex., for defendant.

Barbara K. Hoffman, Small Business Administration, Lubbock, Tex., for Small Business Administration.

## MEMORANDUM AND ORDER

BILL H. BRISTER, Bankruptcy Judge.

Arville Calvin Nivens and Danny Calvin Nivens, father and son, conducted a farming business as a partnership under the name of Nivens and Nivens. Each filed petition for order for relief under Chapter 7 of Title 11, United States Code, on March 18, 1982. The 1981 crop year was the last year in which they operated the farming partnership. As a result of the farming in the 1981 crop year they became entitled to receive "deficiency" payments totalling $36,648.70 and "low yield" or "disaster" payments totalling $912.05 from the Department of Agriculture under the 1981 support programs for upland cotton. The First State Bank of Abernathy ("Bank"), the Small Business Administration ("SBA") and the trustee are competing for those government support payments, represented by checks in the possession of the trustee. The following summary constitutes the findings of fact after nonjury trial.

The bank had furnished the primary financing for the farming partnership during the years of its operations. At the time the petitions in bankruptcy were filed the partnership and the individual debtors were indebted to the bank in the principal sum of $243,369.85 on sixteen separate notes. Those notes were secured by liens on real estate and by security agreements against farm equipment and machinery, crops and livestock, as well as "all checks and income derived from farming." The security agreements were evidenced by financing statements filed of record in the UCC records in the Office of the County Clerk of Hale County, Texas.

The debtor partnership had obtained additional financing from SBA. At the time the petitions in bankruptcy were filed the partnership and the individual partners were indebted to SBA in the principal sum of approximately $337,000 from loans made to the partnership by SBA between September 1979 and March 1981. SBA also holds liens against crops and farm equipment, but has subordinated its liens to those of the bank. No payments have ever been made on the SBA indebtedness.

The trustee has heretofore abandoned any claim of equity in and to the farm equipment, machinery, supplies, harvested crops, livestock and real estate. Some of the government support checks which are in issue in this proceeding were received by the debtors prior to the time the petitions in bankruptcy were filed and were turned over to the trustee by the debtors. The balance of the checks were received by the trustee after the bankruptcy petition had been filed. The bank claims that it has perfected liens under the Uniform Commercial Code against those government support checks by virtue of its lien against crops and, in addition, by virtue of its lien against "all checks and income derived from farming." SBA also claims lien against the checks as result of its lien against crops, but recognizes that its crop liens are subordinate to the bank's liens. However, because it is an agency of the federal government SBA claims that it is entitled to setoff its debt against the government payments, citing as basis therefor the provisions of § 553 of the Bankruptcy Code and 7 C.F.R. § 13.1,[1] et seq. (1981). The trustee challenges the entitlement of the bank and of SBA to those checks by arguing that Article 9 of the Texas Uniform Commercial Code does not apply to the claimed security interests asserted by the bank and by SBA, because the federal statute and the regulations provide their own perfection requirements. Alternatively he argues that if Article 9 does apply neither the bank nor SBA

---

1. That regulation states the conditions under which any amounts approved by ASCS county committees for disbursement to persons under programs administered by the Department of Agriculture, or by any agency thereof, may be withheld or setoff against debts of such persons owing to any department or agency of the United States.

properly perfected their respective security interests in the checks. The trustee contends that neither the Bankruptcy Code nor the statute and federal regulations provide SBA with right of setoff. Finally he contends that if the bank or the SBA prevail on their respective contentions they thereby would preferentially improve position within ninety days of bankruptcy in violation of §§ 547(c)(5) and 553(b) of the Bankruptcy Code.

Preliminarily the nature of, and bases for, those payments [2] should be addressed.

Producers of certain crops, including cotton, who meet all program requirements can qualify for disaster payments to help offset crop losses due to natural disaster or other causes beyond their control. The circumstances justifying the payments include inability to plant or produce a normal crop of cotton due to prevented planting and low yield because of drought, floods, excessive rain, hail, unseasonable frost, high winds, or other abnormal weather phenomena. Entitlement to payment can also be based upon a quarantine imposed by a county, state, or federal government agency which prohibits the planting of a crop or harvesting of a mature crop or which mandates destruction of a planted crop. In addition, low yield payments may result from crop damage or destruction due to severe insect infestation or plant disease, drifting herbicide, damage from livestock not under the control of the producer on the farm or by game animals such as rabbits and deer. In summary, disasters which are not within the control of the producer and which result in the inability of a producer to plant a crop or, if the crop is planted, results in a low yield when compared to the weighted average for that particular farm may entitle the producer to government subsidy payments in the form of "disaster" or "low yield" payments. Thus, the "yield" is the determinative factor for the subsidy payment.

The "deficiency" payments have nothing to do with the yield, but entitlement to those payments result when the price received for the crop is less than the target price which the Department of Agriculture determines for that particular crop. The national average price for the crop year is a factor which is considered in making the deficiency payment determination and thus the amount of the deficiency subsidy payment cannot be made until after the crop year has been completed.

As indicated above the bank and SBA contend that both the "disaster" checks and the "deficiency" checks are crops, substitute for crops, or "proceeds" of crops and thus the perfection by each of them of lien against "crops" effectively constituted perfection of liens against the subsidy checks. The trustee does not challenge the perfection by those creditors of a lien against "crops" under Article 9. First, he contends that Article 9 of the Uniform Commercial Code does not apply to the subsidy payments, because the statutes and the regulations which authorize "disaster" payments and "deficiency" payments provide a separate and distinct procedure for perfection of liens. In that regard he claims that 7 C.F.R. § 709.4 (1981), entitled "Execution of Assignment Form," provides that an assignment [3] of the right to receive those monies must be made in writing on Assignment of Payment Form ASCS–36 and filed in the county office of ASCS prior to the time the county committee approves the making of the payment covered by the assignment. In this case the debtors had not executed Form ASCS–36 in favor of the bank or of SBA.

**2.** The statutory authority for disaster payments and deficiency payments is found at 7 U.S.C. § 1444 et seq. The regulations relevant to those payments are contained in 7 C.F.R., Part 713 (1981).

**3.** Any producer entitled to any payment under the upland cotton program may assign his rights thereto in accordance with the regulations governing assignment of payments, Part 709 of Chapter VII, Agricultural Stabilization and Conservation Service (Agricultural Adjustment), Department of Agriculture. See 7 C.F.R. § 713.23(b)(2) (1981). The provisions of 7 U.S.C. § 1444(e)(11) reflect that the provisions of 16 U.S.C. § 590h(g), relating to assignment of payments, shall apply to payments under § 1444(e).

■ The bank sought to prove that it is not customary for lenders to farmers in the vicinity of Lubbock, Texas, to require that the ASCS–36 Assignment form be executed. That argument lacks persuasion, because if the law mandates that the assignment form be executed before a lien can be properly perfected, custom and habit in a particular area would have no impact in obviating the necessity to comply with those perfection requirements. However, in these proceedings the trustee has confused "assignment" and "lien perfection." An assignment effectively transfers title or right to receive proceeds. On the other hand by perfection of a security interest the creditor intends to secure its debt without requiring the debtor to transfer all right, title or interest in and to the checks unless the debtor defaults in his obligation to the creditor. In the instant proceedings the bank and SBA each sought to perfect a security interest and there was no apparent attempt to obtain an absolute assignment of government payments. Execution of Form ASCS–36 was not required and, under the circumstances, would have been improper. In any event, the underlying purpose of the execution of the assignment form appears to be to insulate the United States from liability for payments to an improper party. 7 C.F.R. § 709.4(a) (1981) requires that the requisite form be executed in order for the assignment to *be recognized by the United States. See United States v. Crain*, 8th Cir. 1945, 151 F.2d 606. Nothing in the statutes or in the regulations indicate that ASCS monies cannot be used as collateral for crop loans obtained by the recipients. Accordingly, I conclude that the claim by the bank and by SBA of security interest is not defeated by the fact that Assignment of Payment Form ASCS–36 was not executed and filed with the county office of ASCS.

Next the trustee contends that the "deficiency" payments and the "disaster" payments are neither crops nor "proceeds" of crops, but are "instruments" where a security interest may be perfected only by the secured party taking possession, citing Tex. Bus. & Comm.Code § 9.304(a) and *First National Bank in Grand Prairie v. Lone Star Life Insurance Company*, 524 S.W.2d 525 (Tex.Civ.App.—Dallas 1975, writ ref'd n. r. e.). He urges that the subject payments cannot be considered "proceeds" because those payments did not derive from a "sale, exchange, or other disposition" which he contends is required by Tex.Bus. & Comm. Code § 9.306(b) and *Weisbart & Company v. First National Bank of Dalhart*, 5th Cir. 1978, 568 F.2d 391.

■ It is apparent that checks are not "crops." However, the subsidy payments in these proceedings are at least substitute for crops or proceeds of crops. The bank and SBA, by their respective liens against crops, covered not only the crop but also the proceeds[4] of those crops. A disaster occurred during the crop year which prevented the yield from being as great as it would have been had the disaster not occurred. The disaster payments are merely the substitute for proceeds of the crop which logically would have been received had the disaster or low yields not occurred. In the same manner the ASCS deficiency payments are made, because it is determined that farmers should receive a target price for the crop. The crop lien includes lien on proceeds and the deficiency payments are monies from the government which make up the differ-

---

4. Neither the security agreement nor the financing statement mentioned "proceeds." However, Tex.Bus. & Comm.Code § 9.203(c) provides that unless otherwise agreed a security agreement gives the secured party the rights to proceeds provided by § 9.306. § 9.306, in pertinent part, provides that "proceeds" include whatever is received upon the sale, exchange, collection *or other disposition* of collateral or proceeds. It defines money, checks, deposit accounts and the like as "cash proceeds" and all other proceeds as "non-cash proceeds." The hereinafter cited *Munger* case is persuasive that no "sale or exchange" must occur before there can be "proceeds." In any event the phrase "other disposition" is extremely broad and permits any type of disposition, actual or constructive. If one insists upon a literal definition of "proceeds" as including "sale, exchange, collection or other disposition" the diminished yield and price are constructive dispositions of the crop for which the government pays and the "other disposition" requirement of § 9.306(b) is met.

ence between the amount of money actually received for the crop and that amount which the Department of Agriculture has determined, on a nation-wide basis, that a producer should receive for a particular crop. It is logical to conclude that the deficiency payments are substitute for proceeds of crops. In accord is *In the Matter of Munger*, 9th Cir. 1974, 495 F.2d 511, where, at page 513, that court noted:

"CCC § 9306(1) defines proceeds broadly as including 'whatever is received when collateral or proceeds is sold, exchanged, collected, or otherwise disposed of.' To us, such a definition indicates that the word 'proceeds' is to be given a flexible and broad content. Furthermore, we assume that the security agreements were drafted with an awareness of the importance of the various forms of federal subsidy payments to the realities of financing a farming operation based upon sugar beets and that an interested third party could also be expected to know that the crops described were sugar beets and entitled to various conditional subsidy payments under the Sugar Act of 1948. . . . Although resembling insurance payments, these subsidy payments flow not from a private contract between the debtor and a third party but rather from a government program designed to protect both the United States sugar industry and the welfare of sugar producers. Abandonment payments, like the subsidy payments based on sugar content, are an integral part of the sugar beet farming business, and, when received, are within a broad reading of 'proceeds.' Not to include such payments within the term 'proceeds' would be to raise distinctions of form over the realities underlying this financing transaction, a result contrary to the intent of the Uniform Commercial Code."

I conclude, therefore, that the bank and SBA has each properly perfected their respective liens in the deficiency payments and in the disaster payments by virtue of their liens against "crops."

■ That conclusion obviates the necessity of addressing the contention by the trustee that lien against the subsidy payment can be perfected only by taking possession of the checks. However, it is noted that while it is true that often a security interest in money or instruments can be perfected only by the taking of possession by the secured party, Tex.Bus. & Comm.Code § 9.304(a) specifically excepts from the possession requirement identifiable cash proceeds where, as here, the original collateral was covered by a security agreement and a properly and timely filed financing statement.

■ It is also unnecessary to address the contention by SBA that it has the right to setoff those subsidy payments against its debt. SBA concedes that it has subordinated its lien against crops and proceeds of crops to the liens of the bank. The determination of the validity of the bank's liens on crops and proceeds, and thus the perfection of liens against the subject "deficiency" payments and "disaster" payments, leaves nothing for SBA to setoff.

The final issue advanced by the trustee is more troublesome. He contends that the recognition of a lien on behalf of the bank and SBA in the subsidy checks would result in an improvement of position by those creditors within ninety days of bankruptcy and, to the extent that the security interest has increased in value, there is an avoidable preference.

Pre-Code cases clearly indicated that a secured party maintained rights in after acquired inventory or receivables. *DuBay v. Williams*, 9th Cir. 1969, 417 F.2d 1277; *Grain Merchants of Indiana, Inc. v. Union Bank and Savings Company*, 7th Cir. 1969, 408 F.2d 209. *DuBay* and its progeny was overruled in the Code by the provisions of § 547(c)(5), applicable to secured creditors claiming security interests in inventory and in accounts receivable, and § 553(b), applicable to any creditor who would otherwise have right of setoff under § 553(a). Crops are categorized as "inventory" by § 547(a)(1). Under § 547(c)(5) a preference will not result to the holder of a perfected

security interest in inventory, including crops, unless and to the extent the holder improves his position during the ninety day period before bankruptcy. That is, the bank and SBA can realize from the collateral only what they could have realized ninety days before the debtors filed their petition in bankruptcy. If the secured creditor improves his position by acquiring a lien in additional after-acquired property during the ninety day period immediately preceding the filing of the bankruptcy petitions, and makes no new advance to match its improved position, there is an avoidable preference to the extent that the security interest increases in value.

On December 18, 1981, the date ninety days preceding the filing of the petitions in bankruptcy, neither the "deficiency" checks nor the "disaster" checks had been issued. In fact, although there was no evidence adduced on this point, it is quite possible that all of the debtors' crops had not been harvested on that date. In any event the amount of the "deficiency" payments could not be determined until after January 1, 1982, because of the necessity of determining, after the conclusion of the crop year, the nation-wide average price. The determination was actually made by the Department of Agriculture on January 26, 1982. In similar fashion, although a total disaster can be determined at the time the disaster occurs, payments based on "low yield" cannot be made until after the crop year has concluded. All of the subsidy checks, totalling $37,560.75 in ASCS payments, were received within the ninety day period preceding the filing of the bankruptcy petition or were received after the bankruptcy petitions had actually been filed. The trustee contends, therefore, that since those checks were not in existence on the ninetieth day prior to bankruptcy the bank and SBA have improved position to that extent.

As indicated in the cited portion of *Munger*, above, it is necessary that the realities underlying the financing transaction prevail over distinctions of form. When the financing transaction was negotiated prior to the beginning of the crop year both the secured creditor and the debtor knew that the crop was not in existence on that date. They knew from experience that several months elapses between the date a crop is planted and the date that it can be harvested. It was within their contemplation that a disaster might occur which could give rise to the right to disaster payments or low yield payments, and that the final price for the crop could fluctuate to less than the target price, which would give rise to deficiency payments. They knew and had reason to know that the precise amount of the disaster payments and the precise amount of the deficiency payments could not be determined until after the crop year had ended.

The nature of a farm crop is unlike that of other types of inventory. For instance, the inventory of a grocery store might change in value from time to time, but the physical nature of the individual items comprising the inventory does not change. It is an easy matter to inventory a grocery store on separate dates and determine whether there has been an increase or decrease in inventory and in value. A lien does not exist until the property against which it is affixed comes into existence. Thus where there is an increase in the volume of the inventory of a grocery store within ninety days of bankruptcy the lien against that increase becomes fixed within the prohibited period and is avoidable. However, if there is only an increase in *value* of the inventory due to market fluctuations, without an accompanying increase in volume of inventory, there is no avoidable preference.

A crop as "inventory" is different from the grocery store inventory example. A crop is continuously undergoing change. Its existence commences as soon as the seed is planted and starts to germinate. It undergoes daily change until it finally matures and is ready for harvest. The lien which was initially fixed against the crops in its embryonic stages continues against the crop in all stages of development. It is the same lien and the same crop. Although the crop is increasing in value the crop was

in existence at all relevant times. While there might be an increase in the value of the crop between the different stages of its development, the "inventory" itself is not increased. There is nothing added within the prohibited period which would mandate avoidance of lien against increase.

 The right to disaster payments and to deficiency payments cannot be separated from the growing crops. Notwithstanding the fact that the crop cannot be harvested until it matures, the crop itself and the right to its proceeds in the form of "deficiency" payments and "disaster" payments have market value during all stages of development. Each farm has a weighted production average so that the amount which a crop should produce under proper conditions can be readily determined. On the ninetieth day prior to the filing of the bankruptcy petition in these cases not only had the value of the harvested and unharvested crops became fixed, the rights to the "deficiency" payments and the "disaster" payments had become fixed. The fact that the calculations of amount and the actual payments were made within the ninety day period does not constitute "improvement of position" of those creditors who held a lien against the crops and proceeds.

I conclude, therefore, that the bank and SBA have properly perfected liens against the "deficiency" payments totalling $36,648.70 and against the "disaster" payments totalling $912.05, that SBA has subordinated its liens to those of the bank, and that neither the bank nor SBA improved their respective positions during the ninety day period preceding the filing of the bankruptcy petitions.

It is, therefore, ORDERED by the Court that First State Bank of Abernathy do have and recover of and from Floyd Holder, trustee, the government checks representing "deficiency" payments of $36,648.70 and the "disaster" payments of $912.05.

LET JUDGMENT BE ENTERED ACCORDINGLY.

The Clerk is directed to file this Memorandum and Order and to furnish a copy thereof to each attorney of record.