**In re Clarence F. CONNELLY and Mary Mae Connelly, Debtors.**

**Bankruptcy No. 3-84-686.**

United States Bankruptcy Court,
D. Minnesota,
Sixth Division.

June 19, 1984.

Michael A. Fahey, Chaska, Minn., for debtor.

Arthur Doten, Minneapolis, Minn., for Norwest Bank Ortonville.

Kip Kaler, Fargo, N.D., for Unsecured Creditors Committee.

Roger Minch, Fargo, N.D., for Prudential Ins. Co. of America.

William Westphal, U.S. Trustee.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

On May 11, 1984, the Debtors filed a motion for authority to borrow funds and grant a security interest. By the same motion they also sought authority to use cash collateral of $24,162.18. A hearing was held on May 23, 1984, at the conclusion of which the Court authorized the Debtors to incur indebtedness in order to proceed with the 1984 crop season. A ruling on the use of cash collateral was reserved and will be addressed herein.

The Debtors farm 5,760 acres in Minnesota and South Dakota, and filed for relief under Chapter 11 of the Bankruptcy Code on April 13, 1984. In 1981, 1982 and 1983, they entered into a grain set-aside program with the Commodity Credit Corporation.

On April 13, 1984, they received four storage payment checks from Commodity Credit Corporation totaling $15,662.18 from 1981 wheat and barley storage. The Debtors seek authority to use this sum and also the sum of $8,500.00 received as pasture rent pursuant to a pasture rent agreement. Norwest Bank-Ortonville and Norwest Agricultural Credit, Inc., (collectively referred to as "Bank") claim a perfected security interest in the foregoing cash collateral and object to its use by the Debtor because adequate protection of its interests cannot be assured. The Debtors are presently indebted to the Bank in the approximate sum of $1,300,000.00 against which the Bank is secured by mortgages on the Debtors' Minnesota and South Dakota land as well as holding a security interest in farm products, machinery and equipment. In addition to their obligation to the Bank, the Debtors are indebted to Prudential in the approximate sum of $2,958,000.00. They have remaining contract for deed obligations totaling approximately $440,000.00 and are in substantial arrears on real estate tax obligations. According to recently amended schedules, the Debtors place a total value of $2,576,000.00 on all real estate. The total crops in storage subject to security interests are valued at some $150,000.00 and all equipment and vehicles subject to security interests are worth approximately $400,000.00. The amount required to service all indebtedness for one year is $423,000.00 not including tax liabilities. The Debtors have not offered any adequate protection to the Bank but instead have asserted that the Bank has no valid security interest in the cash and they are therefore free to use it without any requirement of adequate protection.

1.

The Bank's claimed security interest stems from the terms of a security agreement executed by the Debtors on April 13, 1981. In addition to covering all inventory, equipment and farm products, the security agreement covered in subparts (c) and (d) thereof, accounts, rights to payment and general intangibles; to-wit:

(c) Each and every right of Debtor to the payment of money, whether such right to payment now exists or hereafter arises, whether such right to payment arises out of a sale, lease or other disposition of goods or other property by Debtor, out of a rendering of services by Debtor, out of a loan by Debtor, out of the overpayment of taxes or other liabilities of Debtor, or otherwise arises under any contract or agreement, whether such right to payment is or is not already earned by performance, and howsoever such right to payment may be evidenced, together with all other rights and interests (including all liens and security interests) which Debtor may at any time have by law or agreement against any account debtor or other obligor obligated to make any such payment or against any of the property of such account debtor or other obligor; all including but not limited to all present and future debt instruments, chattel papers, accounts, loans and obligations receivable and tax refunds.

(d) All general intangibles of Debtor, whether now owned or hereafter acquired, including, but not limited to, applications for patents, patents, copyrights, trademarks, trade secrets, good will, trade names, customers lists, permits and franchises, and the right to use Debtor's name.

The Bank asserts that the foregoing provisions are sufficient to afford it a perfected security interest in the Commodity Credit Corporation storage payments. The Debtors, on the other hand, rely for their position upon lien waivers the Bank executed in August and November, 1981, to enable the Debtors to sign up with the Commodity Credit Corporation program. These waivers provide as follows:

The undersigned holder of a lien on the above described commodity does hereby waive, relinquish and surrender all right, title, and interest in and to said commodity in order that the producer may obtain a loan upon the security thereof, or sell the commodity to Commodity Credit Corporation under the price support program and:

(2) Authorize the loan proceeds to be disbursed jointly to the producer and the undersigned lienholder.

The Debtors argue that the storage payments were proceeds of the 1981 crops to which the Bank expressly released its lien, a release which also extends to the proceeds. The issue thus framed is whether they are collateral of another form to which the Bank remains secured. Further discussion necessitates a clear understanding of the precise nature of the Debtors' agreement with the Commodity Credit Corporation.

Producers of wheat and other grains are eligible for participation in a government program popularly termed the wheat reserve program. This program, administered by the Commodity Credit Corporation, has as its purpose the maintenance of commodity prices by holding crops off the market until a pre-determined target price level is reached. Participation in the program is evidenced by two basic documents: a Farm Storage Note and Security Agreement, and a Farm Storage Grain Reserve Agreement. Under the program, Commodity Credit Corporation extends to a producer a farm storage reserve loan pursuant to the terms of the farm storage note which at maturity requires repayment of the principal of the note plus accrued interest. The loans run for a period of three years subject to renewal. It is a requirement that as security for the loan the producer extend to Commodity Credit Corporation a security interest in all grain being placed into the program. This requirement of course mandates that a holder of an existing lien relinquish its interest in the grain, as was done by the Bank in the instant case. Once enrolled in the program, a producer is also paid a sum for storage regardless of whether the grain is farm-stored or warehouse-stored, so long as the national market price remains below the established target price. The storage payments are paid annually at a predetermined rate

based upon the number of bushels in storage, and are generally paid in advance on the anniversary date of the loan agreement. Although the loan itself, plus interest, must eventually be repaid, the payments received for storage need not be repaid unless the producer fails to adhere to the program requirements. 17 C.F.R. § 1421.700 et seq.

From the exhibits submitted to the Court, it appears that the Debtors entered into the following loan agreements:

| Loan # | Loan Date | Commodity | Loan Disbursement Date |
|--------|-----------|-----------|------------------------|
| 72 | 8–26–81 | 1981 Barley | 8–26–81, 4–30–82 |
| 378 | 12–31–81 | 1981 Wheat | 12–31–81, 3–16–83 |
| 382 | 12–31–81 | 1981 Barley | 12–31–81, 11–4–82 |
| 417 | 2–1–82 | 1981 Wheat | 2–1–82, 8–27–82 |
| 114 | 9–9–81 | 1981 Wheat | 9–9–81, 8–27–82 |
| 151 | 10–5–81 | 1981 Wheat | 10–5–81, 8–27–82 |

In each instance the storage payments were a minimum of .265 cents per bushel and according to the agreement were earned for each day the loan was outstanding.

By its security agreement the Bank took security in all farm products including crops and proceeds thereof. In addition, it took and perfected a security interest in every right to payment and all general intangibles. The Debtors argue that the storage payments were the proceeds of the 1981 crops placed in storage and that by waiving its right, title and interest in the crops themselves, the Bank also waived its right to receive the storage payments. The Bank however, does not claim the storage payments are proceeds of the grain to which it released its lien. Irrespective of whether the waiver might also extinguish an interest in proceeds (*See Matter of Special Abrasives, Inc.*, 26 B.R. 399 (Bankr.E.D.Mich.1983), it seems the term "proceeds" as defined in M.S.A. § 336.9–306(1) is not broad enough to cover payments made on account of grain in storage. The term is meant to include anything that is received in consequence of the disposition of collateral. *Production Credit Association of Minot v. Melland*, 278 N.W.2d 780 (N.D.1979). In the instant case, no collateral has been disposed of, it has merely been pledged by the Debtors as security for a loan from the Commodity Credit Corporation. The storage payments while not proceeds of collateral may yet be subject to the Bank's security interest if, as the Bank claims, they come within the catchall umbrella of subpart (c) of the security agreement. By this provision, the Debtors on April 13, 1981, granted the Bank a security interest in all accounts or rights to payment of money arising out of any contract or agreement. Section 336.9–106 of the Minnesota Statutes Annotated includes within the definition of an "account" *any* right to payment for services rendered and defines the term "general intangibles" as including miscellaneous types of contractual rights and personal property which may become the subject of commercial security. The list of what may be encompassed within these broad categories is practically inexhaustible and is restricted only by what parties to a security agreement might have specifically agreed upon or what might normally be encompassed by the terms within the area of commerce the parties were operating in. At the time of entering into the security agreement there was no mistake as to the fact that the Debtors were large grain farmers and that the security being given was inventory, products and crops pertaining to the farming operation. Just as obvious is the fact that the reference to accounts and general intangibles would have to have some meaning in an agricultural context. When the Debtors signed up for the wheat reserve program, they pledged certain 1981 crops as security for government loan. Incidental to the loan they agreed to store the 1981 grain and in ex-

change therefore became entitled to the storage payments. The Court views the Commodity Credit Corporation agreement to pay storage payments to be very similar to the circumstances existing in those cases involving payments made under the PIK program. In the PIK program a producer contracts to hold acreage out of production in exchange for which he becomes entitled to payment-in-kind grain. The 8th Circuit Court of Appeals has recently handed down its decision in *In re Sundberg*, 729 F.2d 561 (8th Cir.1984), wherein it affirmed that a PIK contract was an executory contract which is within the general intangible classification of the Uniform Commercial Code and as a consequence was covered by a security interest in accounts and general intangibles. *See also First State Bank of Abernathy v. Holder*, 22 B.R. 287 (Bankr. N.D.Tex.1982) (involving a security interest in crop deficiency payments). The same rationale is applicable to a producer's right to storage payments payable by virtue of enrolling in a Commodity Credit Corporation Wheat Reserve Program. The Bank in the present instance acquired a security interest in accounts and general intangibles. The Court concludes that the Bank, by virtue of its security agreement, acquired a valid, pre-petition security interest in the storage payment checks.

Section 552(a) of the Code permitting the avoidance of a security interest in after acquired property is not applicable to the instant storage payment checks because the agreement under which the Debtor became entitled to storage payments came into existence long before the Debtor filed for relief. The right to storage payments came into existence the moment the grain went into storage and at that instant the Bank's security interest in accounts and general intangibles attached.

The Debtors have offered no adequate protection for the use of the storage payments without which the Bank's interest therein would be destroyed.

2.

At the hearing, the only testimony presented with regards to the sums allegedly due for pasture rent was from the Debtor himself who stated only that he had $26,500.00 available, $18,000.00 of which came from grain storage and the balance from pasture land rent. The nature of the land rental agreement, its terms, conditions and duration were not established at the hearing. By way of brief, the Debtors claim the rent is derived in two parts—$3,500.00 received as a pre-petition payment on an oral option to rent and $5,000.00 coming due as a consequence of a separate oral lease which apparently has not yet closed. The Court cannot place much, if any, evidenciary weight upon comments made by attorneys in post-hearing briefs. If courts were free to accept such arguments as evidence the door would be open to all manner of incredible and unassailable "facts". The representations by attorney Fahey as to what constituted the lease arrangement simply cannot supplant testimony in open court. The only evidence on this issue is the statement by Clarence Connelly that he has certain cash on hand, $18,000.00 from Commodity Credit Corporation and "the balance came from pasture land rent". From this statement the Court can only conclude that at least as of the date of the hearing on May 23, 1984, all rents had been paid. Whether they were paid before or after the petition or in consequence of a pre or post-petition agreement is unknown. The language of the Bank's security agreement includes all rights to payment of money arising out of a lease of Debtor's property. It is conceded by the Debtors that under M.S.A. § 366.9–203(3) the language of the security agreement would cover the lease payments in question. The Debtors however, have placed reliance upon section 552 of the Code as invalidating the Bank's interest in the $5,000.00 rent payment, the right to which allegedly came into existence post-petition. There is no evidence to support the Debtors' contention on this point. When challenging the extent or validity of a secured creditor's security interest in the context of a motion to use cash collateral, the burden is on the debtor. This burden was not met

in the present instance. The Court therefore presumes that the Bank is secured in all cash presently in possession of the Debtors as pasture land rent. As in the case of the storage payments, no adequate protection has been offered the Bank for use of the pasture rents. In view of the outstanding indebtedness owing to the Bank, it is clear that the Bank's interest and the collateral cannot be protected without adequate protection.

Accordingly and for the reasons above stated, the Debtors' motion for use of cash collateral is in all things DENIED.

SO ORDERED.