**In re BOYD ELEVATOR, INC., Debtor.**

**Bankruptcy No. 586–50279.**

United States Bankruptcy Court,
N.D. Texas,
Lubbock Division.

Aug. 14, 1986.

---

**2.** This Memorandum shall constitute Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 9014.

James V. Hoeffner, Alvis, Carssow & Von Kreisler, Austin, Tex., for debtor.

David L. LeBas, Gibson, Ochsner & Adkins, Amarillo, Tex., for Bank.

William T. Neary, U.S. Trustee, U.S. Dept. of Justice, Dallas, Tex., U.S. Trustee.

## MEMORANDUM OF DECISION

JOHN C. AKARD, Bankruptcy Judge.

On May 5, 1986, Boyd Elevator, Inc. (Boyd) filed its petition in bankruptcy under Chapter 11 of the Bankruptcy Code.

Thereafter Boyd filed its Motion to Use Cash Collateral[1] consisting of receipts for grain storage, and warehouse charges for in-loading and out-loading grain. The First National Bank of Amarillo (Bank) opposed Boyd's Motion on the ground that the funds in question are its cash collateral. The dispute centers around grain storage payments and charges for in-loading and out-loading grain (in-and-out charges). The grain storage payments are payable to Boyd pursuant to a contract with the Commodity Credit Corporation (CCC) dated February 24, 1983.

### Contentions of the Parties

The Bank's position is that the only monies to be received by Boyd are storage charges and "in-and-out charges" under the CCC contract. The Bank claims that the amounts due under the CCC contract are covered by the Bank's Security Agreements which cover, the Bank says, accounts and general intangibles. Thus, the Bank contends such payments fall within the "proceeds" exception to 11 U.S.C. § 522(a) set forth in 11 U.S.C. § 522(b).

Boyd replies that the Bank does not have a valid lien on the proceeds of the CCC contract because the contract constitutes an account. Alternatively, Boyd claims that, should the Bank have a valid lien on the proceeds pursuant to 11 U.S.C. § 522(b), the "equities of the case" exception contained in that same subsection would allow the Court to cut off the lien claim. Further, Boyd claims that the Bank has given implied consent to Boyd's use of the cash collateral by permitting Boyd to use the monies in question until immediately prior to the filing, and, additionally, because the Bank impliedly consented to the use of its collateral in maintaining the estate when it moved for the appointment of a Trustee.

Section 552(a) of the Bankruptcy Code (11 U.S.C. § 522(a)) provides, generally, that "after acquired" property of the estate is not subject to any lien resulting from any security agreement entered into by the Debtor before the filing of the bankruptcy petition. That rule is subject to the exception set forth by § 552(b) which provides that if the Debtor and the Secured Party enter into the Security Agreement before the petition is filed and if the security interest created by the agreement extends to property of the Debtor acquired before the petition is filed and to proceeds of that property, then the security interest extends to the proceeds acquired by the Debtor's estate after the petition is filed to the extent provided by the Security Agreement and by applicable non-bankruptcy law. The rule is subject to the exception that the Court, after notice and hearing and based on the equities of the case, may order otherwise. See Mercantile National Bank at Dallas v. Aerosmith Denton Corp., (In re Aerosmith Denton Corp.), 36 B.R. 116 (Bankr.N.D.Tex.1983).

### Commodity Credit Corporation

The Commodity Credit Corporation (CCC) was established as an agency of the Department of Agriculture in order to stabilize, support, and protect farm income and prices. 15 U.S.C. § 714. The CCC was empowered by statute to contract for the physical handling and storage of agricultural commodities subject to its control. 15 U.S.C. § 714b(h). Boyd is an "approved warehouse" for storage of commodities pursuant to 7 C.F.R. § 1421.7.

The contract for grain storage dated February 24, 1983 executed by Boyd and CCC provides that in exchange for CCC using the warehouse facilities for the storage and handling of grain, CCC will make periodic payments to Boyd.

■ The contract provides that no assignment by the warehouseman shall be made of the agreement or of any rights thereunder except that the warehouseman may assign the proceeds of the agreement to a bank, trust company, or other financing institution that holds a lien or encumbrance at the time of assignment. The assignee is to file with CCC written notice

---

1. Boyd, despite the title of its Motion, disputes that the funds in question are cash collateral.

of the assignment together with a signed copy of the instrument of assignment on a form prescribed by CCC. If the assignee fails to file the written notice of assignment with CCC, the assignment need not be recognized by the CCC. No written notice of assignment was filed with CCC in this case.[2]

### Bank's Liens

In support of its claim that the funds are its cash collateral, the Bank introduced a copy of a $150,000.00 renewal note dated November 26, 1985 issued by Boyd to the Bank. The Note states that it is secured by Security Agreements dated "5/15/84" covering the collateral therein stated. The note recites that "A BRIEF DESCRIPTION OF THE COLLATERAL COVERED THEREIN IS: WAREHOUSE RECEIPTS, INVENTORY, ACCOUNTS RECEIVABLE."

In the instant case, Bank's evidence showed that the first security agreement dated May 15, 1984 covers the following collateral:

All Debtor's INVENTORY of property of every description, whether held for rental, lease or sale, of whatever nature and wheresoever located, and all debtor's accounts, accounts receivable, notes receivable, checks, drafts, contract rights and general intangibles of every nature evidencing Debtor's right to the payment of monies *arising from the sale, leasing, or rental of such inventory items* and/or from the performance of Debtor of services in connection therewith or related thereto; all the foregoing, whether now owned or hereafter acquired by Debtor, and the proceeds and products thereof. (emphasis added)

The second security agreement, also dated May 15, 1984, covers the following collateral:

All Debtor's WAREHOUSE RECEIPTS, now or hereinafter delivered to the Bank together with rights thereunder; all

Debtor's right, title and interest in any Warehouse Receipt, bil [sic] of lading or other document thereafter issued by the same or any other issuer covering all or any part of the property theretofore evidenced in whole or in part by any Warehouse Receipt covered hereunder; and the underlying commodities, goods or property covered in or evidenced by such Warehouse Receipts or other documents; all the foregoin [sic] whether now owned or hereafter acquired and the proceeds and products thereof.

It is undisputed that the liens on inventory and warehouse receipts held by the Bank are valid liens and that the Bank has perfected security interests in inventory and warehouse receipts.

Although the promissory note dated November 26, 1985 recited that the Bank will take a security interest in "warehouse receipts, inventory, and accounts receivable"; no security agreement was ever taken or financing statement filed by the Bank on accounts or on general intangibles.

### Discussion

■ TEX.BUS. & COM.CODE.ANN. § 9.109 classifies goods into four mutually exclusive categories: (1) consumer goods; (2) equipment; (3) farm products; and (4) inventory. The Section states that goods are "inventory" if they are held by a person who holds them for sale or lease or to be furnished under contracts of service or if he has so furnished them, or if they are raw materials, work in process, or materials used or consumed in a business. Inventory of a person is not to be classified as his equipment. Thus, the Bank's lien on inventory and its proceeds does not cover the storage and in-and-out charges under consideration.

TEX.BUS. & COM.CODE ANN. § 1.201(45) (Vernon 1968) states: " 'Warehouse receipt' means a receipt issued by a person engaged in the business of storing

---

**2.** The fact that no notice of assignment was executed and filed, however, would not of itself be sufficent to defeat the Bank's security inter-

est. *First State Bank of Abernathy v. Holder (In re Nivens)*, 22 B.R. 287 (Bankr.N.D.Tex.1982).

goods for hire." Based on the definition of warehouse receipts and the wording of the Bank's security agreement on warehouse receipts set forth earlier in this Opinion, it is patently obvious that the Bank was not attempting to create a lien on Boyd's accounts receivable. Additionally, the Bank presented no testimony at the hearing which indicated that Boyd held warehouse receipts issued by other storage facilities or that Boyd had ever issued warehouse receipts to third parties. The only contract or account receivable discussed at the hearing was that between Boyd and CCC.

TEX.BUS. & COM.CODE ANN. § 9.106 (Vernon's Supp.1986) defines an account as:

... any right to payment for goods sold or leased, or for services rendered which is not evidenced by an instrument or chattel paper, whether or not it has been earned by performance.

The same section defines general intangibles:

"General intangibles" means any personal property (including things in action) other than goods, accounts, chattel paper, documents, instruments, and money....

The 1972 official UCC Comment explains that the account definition is the ordinary commercial account receivable. In some cases a right to receive money not yet earned by performance crystallizes *not* into an account, but into a general intangible, for it is a right to payment of money but is not "for goods sold or leased or for services rendered." Examples of such rights are the right to receive payment of a loan not evidenced by an instrument or chattel paper; a right to receive partial refund of purchase prices paid by reason of retroactive volume discounts; and rights to receive payment under licenses of patents and copyrights, exhibition contracts, etc.

While case law is somewhat sparse in this area, *In re Connally,* 41 B.R. 217 (Bankr.D.Minn.1984) contains a fact situation very similar to that of the instant case. The *Connally* Debtors were farmers who sought to use four storage payment checks received from the Commodity Credit Corpo-

ration as cash collateral. The bank disputed their right to use the funds on grounds that it held a security agreement covering inventory, equipment, farm products, accounts, rights to payment and general intangibles, thus giving it a perfected security interest in the Commodity Credit Corporation storage payments. The bank did not claim that the storage payments were proceeds of the grain, but that the proceeds were subject to its security interest in accounts or rights to payment of money arising out of any contract or agreement. The Court analogized the CCC agreement to pay storage payments as very similar to the circumstances existing in the cases involving payments made under the PIK Program. *Id.* at 221. The Court cited with favor *In re Sunberg,* 729 F.2d 561 (8th Cir.1984), wherein it affirmed that a PIK contract was an executory contract which is within the general intangible classification of the UCC and as a consequence, such a contract is covered by a security interest in accounts and general intangibles. *Id. See also First State Bank of Abernathy v. Holder (In re Nivens), supra.* Using that rationale, the *Connally* Court concluded that the bank acquired a valid prepetition security interest in the storage payment checks pursuant to its security agreement.

### Decision

■ It is the opinion of this Court that the Bank does not hold a valid lien on the monies paid to Boyd as storage charges and "in-and-out" charges since they are either accounts or general intangibles, neither of which are covered by the Bank's security agreements. The rental income for grain storage and "in-and-out" storage charges are therefore available to the Debtor for its use in promulgating its Plan of Reorganization. For these reasons, the Bank's Motion to Modify Stay will be denied.

Because of the Court's ruling, we do not reach the issue of the equities of the case exception or the issue of implied consent.

With regard to the Bank's Motion for Appointment of a Trustee, the evidence showed no fraud, dishonesty, incompetence, or gross mismanagement in the affairs of this corporate Debtor, either before or after the commencement of the case pursuant to 11 U.S.C. § 1104(a)(1). The Motion will be denied. Since the Bank presented insufficient evidence to meet the cause requirements of 11 U.S.C. § 1112(b), the Bank's Motion to Convert to Chapter 7 will also be denied.[3]

A separate Order reflecting the Court's decision shall be entered herein.[4]

### ORDER CONCERNING USE OF CASH COLLATERAL

On May 19, 1986 the Court heard the Motion of Boyd Elevator, Inc. (the Debtor) to Use Cash Collateral. The Debtor did not admit that the funds which it intended to use were cash collateral but rather filed the Motion in response to objections by the First National Bank of Amarillo (Bank). At the conclusion of that hearing, the Court entered a preliminary Order dated June 4, 1986 permitting the Debtor to use 50% of the proceeds of each check from Commodity Credit Corporation (CCC) then on hand, or to come into the Debtor's possession, up to $10,000.00. To the extent that such 50% exceeded $10,000.00, the monies were to be placed in an escrow account at the Bank pending further Order of the Court. The same Order provided that 50% of the proceeds from such checks should be paid to the Bank. The Order further provided that the Debtor should not pay any funds on any mortgages on real property which was owned by any director or officer of the Debtor and that no monies should be expended by the Debtor for payment of salary or personal expenses for or on the account of any officer or director of the Debtor or any relative of any officer or director of the Debtor.

On June 23, 1986 as a result of a hearing held on June 12, 1986, the Court entered its Order on Motion to Convert, Motion to Appoint Trustee, Motion to Modify Stay, and Motion for Use of Cash Collateral. That Order specifically denied the Motions of the Bank to convert this case to a Chapter 7, to have a Trustee appointed in this Chapter 11 proceeding, and to lift the automatic stay with respect to the Bank. The Order further provided that the Debtor and the bank should each receive one-half of any CCC checks and of any ASCS checks received by the Debtor.

For the reasons outlined in the Memorandum of Decision of even date herewith, the Court has concluded that the Bank does not have a lien on the Debtor's accounts and general intangibles. Thus the payments to the Bank from monies received from the CCC and ASCS subsequent to the filing of the Petition in these proceedings represent a preliminary distribution on the Bank's claim in this proceeding. It is the opinion of the Court that the Bank should not be required to refund such sums to the Debtor, but rather to account for such sums in any distribution made under a Plan of Reorganization in these proceedings. The Court notes that only five creditors were listed in the Schedules in these proceedings and that two of them are indicated to be personal creditors of Mr. Edward Boyd and not of the corporation.

It is therefore ORDERED that:

1. As stated in the Order dated June 23, 1986 and for the reasons set forth in the Memorandum of Decision of even date herewith, the following Motions are denied:

   a. The Bank's Motion to Convert this case to a Chapter 7.

   b. The Bank's Motion to Appoint a Trustee in these proceedings.

---

**3.** Apparently, the Bank has had other unhappy experiences with Mr. Edward Boyd, President of Boyd Elevator, Inc., relating to cattle; however, these dealings were with Mr. Boyd, personally, and not with the Debtor.

**4.** This Memorandum shall constitute Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052 which is made applicable to contested matters by Bankruptcy Rule 9014.

c. The Bank's Motion to be relieved from the automatic stay.

2. For the reasons stated in the Memorandum of Decision of even date herewith, the Court determines that the Bank has no lien on the Debtor's accounts or general intangibles so that the Debtor's Motion to Use Cash Collateral is denied as moot.

3. Any monies placed in escrow (together with accrued interest thereon) because they exceeded the $10,000.00 maximum specified in the Order of June 4, 1986, shall be paid by the Bank to the Debtor when this Order becomes final and non-appealable.

4. All other funds received by the Bank as a result of the Orders dated June 4, 1986 and June 23, 1986 shall be retained by the Bank until further order of this Court and, if not otherwise ordered, shall be considered a preliminary distribution to the Bank under a Plan of Reorganization in these proceedings.

■ The Court is concerned that funds belonging to this Debtor might be used for the benefit of personal creditors of the principals of the Debtor. On the other hand, the Court understands that the active officers of the Debtor are entitled to a reasonable salary for services actually performed on behalf of the Debtor.

It is therefore ORDERED that:

1. The Debtor shall not pay funds on any mortgages on any real property owned by any director or officer of the Debtor.

2. No monies shall be expended by the Debtor for payment of rent, salary, or personal expenses to or for the account of any officer or director of the Debtor or any relative of any officer or director of the Debtor.

3. The Debtor shall be entitled to file a Motion to pay any of the aforesaid expenses so long as they are reasonable and necessary expenses. Copies of such Motion specifying the amounts to be paid, to whom, and the regularity of such payments along with a proposed operating budget, shall be submitted by the Debtor to all of the creditors in this proceeding and to the United States Trustee. The Debtor shall cause such Motion to be set for hearing before the Court at which time the Court will determine the matter.