Saad, P.J.
 

 Plaintiff Conagra, Inc. (doing business as Berger and Company) appeals as of right the trial court’s order granting summary disposition in favor of defendant Farmers State Bank in this commercial law and contract case. Farmers avers that the trial court reached the correct result for the correct reason, but cross appeals seeking to preserve its alternative arguments on appeal. We reverse the trial court’s order of summary disposition for Farmers and remand for further proceedings.
 

 I. NATURE OF THE CASE
 

 Both parties made loans to Craig and Brenda Brennan, the owners of Brennan Farms, Inc., and both took a security interest in the farm’s crops. Because Farmers made the first loan and had a prior blanket security interest in the farm’s crops, Farmers and Conagra entered into a subordination agreement in which Farmers agreed to give Conagra priority interest in 294 acres of the 1994 bean crop to induce Conagra to make its loan to the Brennans. Subsequently, the bean crop was destroyed by bad weather, and the federal government paid disaster relief money to Brennan Farms for this loss. Without repaying the debt to Conagra, the Brennans used the government payments to pay their debt to Farmers. Conagra sued Farmers, claiming, inter alia, that Conagra’s security interest in the beans included a security interest in the government payments as proceeds of the beans. The trial court granted Farmers’ motion for summary disposition. We reverse and remand for further proceedings.
 

 
 *113
 
 Although Farmers’ interest in the
 
 beans
 
 had been perfected before Conagra’s interest, Conagra’s interest took priority by virtue of a subordination agreement with Farmers. However, the subordination agreement did not specify if Conagra also took a priority interest in the
 
 proceeds
 
 of the beans. During the trial, Farmers contended that the government payments are not proceeds of the beans and that Conagra had no entitlement to the federal relief money.
 

 To put this matter in proper perspective, we note that Farmers admitted during oral argument that the subordination agreement—though silent with respect to proceeds—nonetheless would have protected Conagra’s interest in the bean crop’s “proceeds” if Brennan Farms had sold the beans for cash. Nonetheless, Farmers maintains that Conagra has no entitlement to the government money on the grounds that (1) government disaster relief is not proceeds under the Uniform Commercial Code (ucc); (2) if government disaster relief were to be considered proceeds under the ucc, the cash payments were not
 
 identifiable
 
 proceeds as required by the UCC, unless the creditor received an assignment of the government payments; and (3) the subordination agreement, which gave Conagra priority regarding the beans, did not cover government relief payments.
 

 Consequently, we must resolve the following questions, each of which raises an issue of first impression under Michigan law: (1) Are government relief payments for a destroyed crop proceeds under UCC 9-306? (2) Are the government relief monies identifiable proceeds here, where the relief checks did not itemize the amount paid according to each crop lost? and (3) Should the subordination agreement be inter
 
 *114
 
 preted to cover proceeds, and thus subordinate Farmer’s security interest in the government disaster relief to Conagra’s interest?
 

 As a matter of law, we hold that government disaster relief payments for destroyed crops are proceeds within the meaning of UCC 9-306 and that the subordination agreement covered proceeds. We remand to the trial court with instructions to hold a hearing to trace the amount of the government payments that are attributable to the bean crop.
 

 n. FACTS AND PROCEEDINGS
 

 Craig and Brenda Brennan are the owners of Brennan Farms, Inc.
 
 [1]
 
 Defendant Farmers State Bank began loaning money to Brennan Farms in 1985. In February 1994, in return for a $225,000 line of credit, Farmers obtained a blanket security interest in the crops, equipment, and other assets of Brennan Farms. Craig Brennan also sought a loan from Conagra. Conagra responded that it would approve financing only if Farmers agreed to subordinate $80,000 of Farmers’ secured interest in the Brennans’ 1994 bean crop to Conagra so that Conagra could possess the primary security interest in “294 acres dry edible beans.” An appendix to the subordination agreement described the particular 294 acres referenced in the subordination agreement.
 
 [2]
 
 Other acreage dedicated to the Brennans’ bean crop was not covered by the sub
 
 *115
 
 ordination agreement. On February 15, 1994, Tim Miller, Farmers’ vice president and loan officer, executed the subordination agreement. The subordination agreement did not specify if Farmers also subordinated its interest to
 
 proceeds
 
 of the beans as well as the beans themselves. Although Farmers has not been entirely consistent in its position, it contends that the subordination agreement cannot be interpreted as protecting Conagra’s right to the government payment. In contrast, Conagra maintains that Farmers knew at the time it executed the subordination agreement that the agreement extended to the
 
 proceeds
 
 of the beans as well, which includes the federal disaster relief.
 

 On March 8, 1994, the Brennans executed a security agreement with Conagra. The language of this agreement was broader than the subordination agreement because it granted Conagra a secured interest in
 
 all crops
 
 grown by the Brennans (not just the 294 acres of dry beans mentioned in the subordination agreement), as well as farm equipment and other assets. This agreement also contained a provision granting Conagra a security interest in
 

 general intangibles and payments of any kind relating to or arising from the crops described herein, including but not limited to, insurance payments and payments, certificates of other property rights or
 
 entitlements resulting from any government and/or private programs,
 
 all of the foregoing being hereinafter referred to as collateral. [Emphasis added.]
 

 Farmers maintains that until April 24, 1995, Conagra never notified it of its crop lien or any claim that Conagra had to disaster payments. However, according to Conagra, Conagra filed its UCC-l/financing state
 
 *116
 
 ment (which contained the above-cited language) as well as an attached land description with the Gratiot County Register of Deeds on March 24, 1994. Conagra also alleges that about October 10, 1994, Farmers requested and received a financing statement search that specifically identified Conagra’s ucc-l/fmancing statement.
 
 [3]
 

 In 1994, inclement weather damaged or destroyed much of Brennan Farms’ crops, including the bean crop in which Conagra and Farmers held a security interest. In October 1994, the Brennans applied for federal disaster payments from the Consolidated Farm Service Agency, formerly the Agricultural Stabilization and Conservation Service, a division of the United States Department of Agriculture. At that time, Farmers took an assignment from the Brennans of the expected disaster payments. About March 21, 1995, the Brennans assigned to Farmers disaster payment checks totaling $100,000. Farmers applied $49,199 of the money to the Brennans’ loans with Farmers and released the balance of $50,801 to the Brennans. According to Department of Agriculture records, which Conagra later obtained pursuant to a Freedom of Information Act request, $17,284 of the disaster payments was attributable to the bean crop in which Conagra held a security interest ($11,672 from the Gratiot County crop plus $5,612 from the Midland County crop). However, the checks themselves did not contain this information, nor did they specify the particular acres involved in the crop damage, i.e., whether the disaster payments covered
 
 *117
 
 beans grown on the 294 acres designated as Conagra’s security interest.
 

 On April 24, 1995, Conagra’s counsel sent Farmers a demand for release of any disaster monies that Farmers had received for the Brennans’ failed bean crop. Farmers refused to release this money to Conagra and Conagra filed suit on May 17, 1996. Conagra stated causes of action against Farmers for breach of contract and negligence/conversion of collateral and against the Brennans for breach of contract/account stated.
 
 [4]
 

 On September 30, 1996, Conagra moved for summary disposition against Farmers, claiming a right to the $17,284 in government disaster payments for the damaged bean crop.
 
 [5]
 
 The key issues addressed in this motion were the following: (1) Are the government payments proceeds of the beans in which Conagra held a security interest? and (2) Does the subordination agreement give Conagra any interest in proceeds of the beans and thus priority over Farmers’ interest in these proceeds? Conagra asserted that there were no genuine issues of disputed facts regarding these issues and that Farmers had no valid defenses. Farmers opposed Conagra’s motion and requested summary disposition in its favor. Farmers argued that the subordination agreement—which Conagra drafted— made no mention of proceeds and therefore pertained only to the beans themselves. Farmers also argued that under the UCC, Conagra never held a security agreement in the disaster payments because (1) the
 
 *118
 
 checks were never proceeds from collateral that Conagra had an interest in, because the beans never existed, and (2) the checks were not identifiable as proceeds from the beans because they were nonitemized payments for all the damaged crops, not merely the “dry edible beans.” Farmers further argued that it was a bona fide holder in due course, without knowledge of Conagra’s claim to the disaster monies, and, as such, was entitled to take the checks free of Conagra’s security interest. Additionally, Farmers argued that Conagra was estopped from asserting any right to the disaster payments.
 

 The trial court stated that, under the ucc, Conagra’s subordination agreement did protect Conagra’s interest in identifiable proceeds of the bean crop, as well as the crop itself, stating:
 

 And the Bank argues, all you ever had, Berger [i.e., Conagra], was a security interest in the beans themselves, not in any proceeds. My view is in the real world, Berger’s got the best of that argument.
 
 In the real world, people understand, particularly sophisticated creditors understand, that those bean crops pledged included identifiable proceeds.
 
 Farmers State Bank wouldn’t be here if these beans had been sold in violation of the security agreement at the elevator and the Brennans walked in and said, hey, look, we just sold those beans over at the elevator, here’s a check to you from the proceeds. Bank’s going to be on notice, given the filing, that those are proceeds from those beans and that they are junior to Berger. So if the beans had been converted to money by sale, I think most people would say, and I think the law clearly would say, more importantly, that those are subject to the prior lien of Berger. If the crop had been wiped out and there was crop insurance and the check came in and Brennans wanted to use it to apply to the debt of Farmers, we’d all agree that’s proceeds.
 

 
 *119
 
 However, the trial court then decided that the disaster relief checks were not, in fact,
 
 identifiable
 
 bean proceeds to which Conagra’s security interest attached:
 

 When one looks at the checks and the payments made and received and disbursed in March of ‘95, those are not the identifiable proceeds of this bean crop. Would research uncover that some of these payments maybe [sic] made, received, and disbursed on account of the loss of these 294 acres of dry edible beans? Maybe. It seems to me probably now, with hindsight, we could reconstruct that and determine how much, probably do it in a precise dollar amount. But that wasn’t the situation when these checks were received, negotiated and the proceeds disbursed by the Bank.
 

 Also, although the trial court did not explicitly find that Farmers was a holder in due course of the checks, the trial court also seemed to agree with Farmers’ argument concerning Farmers’ holder in due course status. The trial court granted Farmers’ motion for summary disposition in a February 7, 1998, order.
 

 m. ANALYSIS
 

 A. GOVERNMENT RELIEF PAYMENTS AS PROCEEDS FOR LOST CROP
 

 The trial court ruled that the government disaster payments are proceeds of the beans, but ruled against Conagra because it held that these were not “identifiable” proceeds within the meaning of the Uniform Commercial Code. Conagra does not raise any argument on appeal regarding the former part of this ruling. Farmers also does not raise this issue as part of its cross appeal, opting instead to rely on the “identi
 
 *120
 
 fiable proceeds” issue and arguments regarding the scope of the subordination agreement and its alleged status as a holder in due course. Farmers’ position, however, is somewhat inconsistent: it tacitly approves both parts of the trial court’s ruling by asserting that the trial court reached the “correct result for the correct reasoning,” but it also avers in its response to Conagra’s appeal brief that the payments are not proceeds because they are more akin to a “welfare payment” than an insurance payment for damaged property. Although this issue is not preserved, it is a threshold issue we must resolve before proceeding to the other issues on appeal. Because the issue is a question of law and the facts necessary for the resolution of the question have been presented, we may review it though the parties did not preserve the issue for appeal.
 
 Westfield Cos v Grand Valley Health Plan,
 
 224 Mich App 385, 387; 568 NW2d 854 (1997).
 

 When statutory language is clear and unambiguous, we must honor the legislative intent as clearly indicated in that language.
 
 Western Michigan Univ Bd of Control v Michigan,
 
 455 Mich 531, 538; 565 NW2d 828 (1997);
 
 In re Messer Trust,
 
 457 Mich 371, 379-380; 579 NW2d 73 (1998). An issue of statutory construction is a question of law that we review de novo.
 
 Michigan State AFL-CIO v Secretary of State,
 
 230 Mich App 1, 24; 583 NW2d 701 (1998).
 

 Secured transactions are governed by Article 9 of the ucc, adopted in Michigan in 1962 and codified at MCL 440.9101
 
 et seq.)
 
 MSA 19.9101
 
 et seq.
 
 Generally, a security interest in collateral “continues in collateral notwithstanding sale, exchange or other disposition thereof . . . and also continues in any
 
 identifiable proceeds
 
 ...” though the parties have not specifically
 
 *121
 
 included “proceeds” in their security agreements or ucc-l/financing statements. MCL 440.9306(2), (3); MSA 19.9306(2), (3) (emphasis added). Section 9-306 of the UCC defines “proceeds” as follows:
 

 “Proceeds” includes whatever is received upon the sale, exchange, collection or other disposition of collateral, or proceeds. Insurance payable by reason of loss or damage to the collateral is proceeds, except to the extent that it is payable to a person other than a party to the security agreement. Any payments or distributions made with respect to investment property collateral are proceeds. Money, checks, deposit accounts, and the like are “cash proceeds”. All other proceeds are “noncash proceeds”. [MCL 440.9306(1); MSA 19.9306(1).]
 

 Because neither the Michigan Supreme Court nor this Court has previously addressed the question whether government disaster payments or other types of government agricultural subsidies qualify as “proceeds” under this provision, we will consider the decisions of our sister states and federal courts that have addressed this issue.
 
 In re Martin,
 
 450 Mich 204, 218; 538 NW2d 399 (1995).
 

 We opt to apply the comprehensive approach set forth in
 
 In re Schmaling,
 
 783 F2d 680 (CA 7, 1986), and its progeny in this case. The holding in
 
 Schmaling
 
 can be summarized as a three-pronged test in which governmental agricultural payments qualify as proceeds when three conditions are satisfied: “First, a crop must be planted, second there must be a disposition of the crop, and third the entitlement which the secured creditor is claiming must have been received in connection with that disposition.”
 
 In re Ladd,
 
 106 Bankr 174, 176 (CD Ill, 1989). All three conditions are satisfied here.
 

 
 *122
 
 Although the
 
 Schmaling
 
 court determined that the government subsidy at issue there was
 
 not
 
 proceeds, several cases applying the
 
 Schmaling
 
 test have concluded that government disaster relief payments for weather-destroyed crops do qualify as proceeds of the lost crop.
 
 In re Ring,
 
 169 Bankr 73 (MD Ga, 1993), aff'g 160 Bankr 692 (MD Ga, 1993);
 
 In re White,
 
 1989 WL 146417 (Bankr ND Iowa, 1989). Because we believe that the
 
 Schmaling
 
 decision regarding government payments is based on a sound construction of § 9-306 (see discussion below), we apply it here.
 

 The Seventh Circuit Court of Appeals held in
 
 Schmaling, supra,
 
 681, that com deliveries from the federal government’s payment in kind (pik) program that were not a substitute for an existing crop were not proceeds under the ucc. The farmers/debtors in
 
 Schmaling
 
 agreed, pursuant to the PIK program, that they would not plant a specified percentage of their farm’s acreage base and designated crops. In return, the government provided the farmers with a commodity equal in quantity to a percentage of what the non-planted acreage would normally yield.
 
 Id.
 
 One of the farmers’ creditors held a security interest in the farmers’ grown or growing com crop. During bankruptcy proceedings, this creditor claimed that the debtors’ pik com was proceeds of the com crop and therefore security for the creditor’s loan.
 
 Id.
 
 The bankruptcy court ruled in favor of the creditor on the ground that PIK payments were “exchanged” for the debtors’ own potential com crop.
 
 Id.,
 
 682. The Seventh Circuit Court of Appeals disagreed, holding:
 

 For something to be “proceeds” of crops ... it must be received upon their “sale, exchange, collection or other disposition.” UCC § 9-306(2);
 
 In re Connelly,
 
 41 BR 217, 220
 
 *123
 
 (Bankr D Minn, 1984) .... But in the instant case there was never a crop of which to dispose. No com was grown on the Schmalings’ real estate. One condition for participating in the pik program was that individuals
 
 not
 
 plant a crop.
 
 [Id.,
 
 682-683 (emphasis in original).]
 

 Under the
 
 Schmaling
 
 analysis, the government payments made to Brennan Farms qualify as proceeds. Under the
 
 Schmaling
 
 test, government subsidies that are intended as compensation for the loss or destruction of a planted crop qualify as proceeds. If the farmer actually planted a crop, which was subsequently lost or destroyed, and the government payment was directly linked to that lost crop, then the payment is a form of proceeds. The
 
 Schmaling
 
 court approved previously decided cases in which the court distinguished proceeds from nonproceeds on this basis. Most germane here, the court in
 
 Schmaling,
 
 683, approved
 
 In re Nivens,
 
 22 Bankr 287 (ND Tex, 1982), where the court held that federal disaster payments made to a farmer who is unable to “plant or produce a normal crop Of cotton due to prevented planting and low yield,”
 
 id.,
 
 290, qualified as proceeds because the disaster payments were “merely the substitute for proceeds of the crop which logically would have been received had the disaster . . . not occurred.”
 
 [6]
 

 Id.,
 
 291.
 

 Since
 
 Schmaling,
 
 other jurisdictions have relied on the
 
 Schmaling
 
 test and have concluded that federal disaster relief payments for damaged crops are proceeds because they are a substitute or compensation for a planted, but lost, crop. In
 
 Ring, supra,
 
 169
 
 *124
 
 Bankr 73, 76, the court held that because disaster payments were analogous to insurance payments for crop loss or damage, they qualified as proceeds under § 9-306. In
 
 White, supra,
 
 *5, the court held that the three
 
 Schmaling
 
 requirements were satisfied because “ ‘disposition’ of the crop occurred when part of the Debtor’s unmatured crops were damaged or destroyed by weather conditions” and “[t]he Debtor’s entitlements under the [subsidy] were received in connection with that disposition.”
 

 The
 
 Schmaling
 
 court’s approval of decisions involving other kinds of pik subsidies further illustrates the application of the
 
 Schmaling
 
 test. Although these cases are not strictly relevant to the issue before us, they are helpful in understanding Schmaling’s emphasis on § 9-306’s requirement that there be a disposition of existing collateral. In
 
 In re Kruse,
 
 35 Bankr 958 (D Kan, 1983), the pik subsidies in question were held to be proceeds because they were a substitute for crops that had been originally planted but were plowed under. However, the
 
 Kruse
 
 court held that PIK revenues that related to fields that had not been planted at all were not proceeds, but general intangibles. In
 
 In re Munger,
 
 495 F2d 511 (CA 9, 1974), the court held that a federal subsidy payment was proceeds, because it was paid to a farmer as a substitute for a crop he had planted, but abandoned.
 

 In contrast, government relief not connected to the loss or destruction of an existing crop does not qualify as proceeds under the
 
 Schmaling
 
 test, because there has been no “disposition” as required by § 9-306. In
 
 Ladd, supra,
 
 176-177, the court applied the
 
 Schmaling
 
 test and ruled that the government “disaster” relief was not proceeds because it did not com
 
 *125
 
 pensate the farmer for a destroyed crop. Instead, it was a “deficiency payment” that compensated the fanner for drought-caused low yields, based on historical yields for the acreage involved multiplied by a particular percentage. See also
 
 In re Kingsley,
 
 865 F2d 975 (CA 8, 1989) (government payments for diversion of cropland to conservation land in lieu of planting and deficiency payments from federal price support program were not proceeds);
 
 In re Kruger,
 
 78 Bankr 538 (CD Ill, 1987) (deficiency payments for crop price support not proceeds).
 

 We find that the disaster relief payment to Brennan Farms satisfies all three requirements under
 
 Schmaling.
 
 First, there is no dispute that Brennan Farms planted the beans. Second, the crop was “disposed” when it was lost to bad weather. Third, the government entitlement was received in connection with that disposition: the government would not have paid the money if the crop had not been destroyed. Accordingly, we hold that the government disaster payments for the destroyed crops are proceeds within the meaning of § 9-306.
 
 [7]
 

 
 *126
 
 In sum, we hold that the government disaster payment to Brennan Farms is “proceeds” under UCC 9-306 because it was intended as a substitute for the lost crops. We therefore turn to the second issue, which is the first issue Conagra raises on appeal: Are the government payments
 
 “identifiable
 
 proceeds”?
 

 B. IDENTIFIABLE PROCEEDS
 

 Though the trial court correctly held that the government payments were proceeds, the trial court incorrectly ruled that they were not “identifiable” proceeds. Contrary to the trial court’s ruling, the checks did not have to differentiate what amount of money was attributable to which lost crop in order for the proceeds to be identifiable.
 

 While the UCC defines proceeds, it does not define “identifiable” proceeds. Regarding proceeds, the ucc provides:
 

 (1) “Proceeds” includes whatever is received upon the sale, exchange, collection or other disposition of collateral, or proceeds. Insurance payable by reason of loss or damage to the collateral is proceeds, except to the extent that it is payable to a person other than a party to the security agreement. Any payments or distributions made with respect to investment property collateral are proceeds. Money, checks, deposit accounts, and the like are “cash proceeds”. All other proceeds are “noncash proceeds”.
 

 (2) Except where this article otherwise provides, a security interest continues in collateral notwithstanding sale,
 
 *127
 
 exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.
 

 (3) The security interest in proceeds is a continuously perfected security interest if the interest in the original collateral was perfected but it ceases to be a perfected security interest and becomes unperfected 10 days after receipt of the proceeds by the debtor unless:
 

 (b) A filed financing statement covers the original collateral
 
 and the proceeds are identifiable cash proceeds
 
 .... [MCL 440.9306; MSA 19.9306. (emphasis added)]
 

 This case presents the following question of first impression under Michigan law: Are the proceeds of a specific item of collateral “identifiable” when the proceeds are part of a lump-sum cash payment that includes cash paid for noncollateral items?
 

 Because the ucc does not define “identifiable cash proceeds,”
 
 [8]
 
 we turn to the widely quoted UCC treatise, Uniform Commercial Code Series by William D. Hawkland, Richard A. Lord, and Charles C. Lewis, for a discussion of the meaning of this term:
 

 The proceeds in which the security interest continues under subsection 9-306(2) are not, however, just any proceeds, but rather identifiable proceeds including collections received by the debtor. The term “identifiable” is not defined in the Code, but it presumably requires that the secured party show that the cash or noncash items were actually received upon the sale, exchange, collection or
 
 *128
 
 other disposition of the collateral or proceeds. [Hawkland, Lord, & Lewis, UCC Series, § 9-306:3, pp 39-41 (1997).]
 

 We agree that this discussion is based on a sound construction of § 9-306. Accordingly, Conagra must show that a specific amount of the government payment corresponded to the disposition of the bean crop. Farmers contends, and the trial court agreed, that Conagra cannot do this because at the time the Brennans received the checks, the payments were not itemized by crop. Though we found no case law involving the precise issue before us, cases involving commingled cash proceeds offer a pertinent analogy. We again turn to Professor Hawkland, who writes:
 

 The requirement of identifiable proceeds is, of course, particularly troublesome when the proceeds are cash proceeds which have been commingled with other cash held by the debtor. Although Professor Gilmore suggests that any such commingled cash proceeds are lost because they are no longer identifiable, equitable tracing methods have been invoked to find identifiable cash proceeds even though they have been commingled with cash in other accounts of the debtor. [Hawkland, § 9-306:3, p 41.]
 

 An ample body of case law prescribes detailed rules on “tracing” cash proceeds that have been deposited in various accounts in which the debtor has made other deposits and withdrawals. See, for example, Barnes,
 
 Tracing commingled proceeds: The metamorphosis of equity principles into UCC doctrine,
 
 51 U Pitt L R 281 (1990); see also
 
 Farmers & Merchants Nat’l Bank v Sooner Cooperative, Inc,
 
 766 P2d 325 (Okla, 1988);
 
 General Motors Acceptance Corp v Norstar Bank, NA,
 
 141 Misc 2d 349; 532 NYS2d 685 (S Ct, 1988);
 
 Brown & Williamson Tobacco Corp v First Nat’l Bank of Blue Island,
 
 504 F2d 998 (CA 7, 1974).
 
 *129
 
 It is not necessary for us to review in detail the rules that other courts have developed for tracing cash proceeds. It suffices to say that cash proceeds do not lose their identity merely because the cash proceeds have been commingled with other cash, provided that there is some basis for the court to connect a specified amount of the commingled cash to the original collateral. By analogy, the cash proceeds of the beans did not lose their identity merely because they were “commingled” in a lump-sum payment with cash proceeds from other crops, as long as we can determine how much of the payment is connected to the bean crop.
 

 Here, there is a sufficient basis for connecting a specific portion of the government payment to the bean crop. Although the government’s checks to the Brennans did not specify the amount of disaster payment for each of the lost crops, the Department of Agriculture released this information to Conagra upon request. According to these documents, $17,284 was payable for the lost beans; the balance was attributable to lost beets and cucumbers. This information allowed the parties, and the trial court, to determine what part of the payment was “identifiable proceeds” for the lost beans, although the bean payment was “commingled” with the beet and cucumber payments. Indeed, it would appear that the trial court could identify $17,284 as proceeds of the bean crop with far greater certainty than a court could identify proceeds from a particular item of collateral in a commingled bank account situation.
 
 [9]
 
 However, because the trial
 
 *130
 
 court did not adequately address this issue, we are unwilling to decide on appeal the exact amount of the disaster relief payment that is attributable to the beans. Accordingly, we remand this matter to the trial court to review the evidence and determine the amount of money the federal government paid the Brennans to compensate them for the lost bean crop.
 

 C. SCOPE OF SUBORDINATION AGREEMENT
 

 Having concluded that the trial court erroneously ruled that the proceeds were not identifiable as a matter of law, we now must consider if the subordination agreement provided Conagra with a superior interest in the proceeds of the beans as well as the beans themselves. The subordination agreement made no mention of proceeds. Consequently, the third issue is: Does a first creditor’s agreement to subordinate its security interest in specific collateral to a second creditor also subordinate the first creditor’s interest in the
 
 proceeds
 
 of that collateral? This also is a question of first impression in Michigan that has received scant attention in the UCC case law and literature.
 
 [10]
 

 Under the UCC, a creditor’s security interest continues in the collateral’s identifiable proceeds. MCL 440.9306(2); MSA 19.9306(2). The creditor’s security interest in proceeds is a continuously perfected security interest if the interest in the original collateral was
 
 *131
 
 protected and the proceeds are identifiable cash proceeds. MCL 440.9306(3); MSA 19.9306(3). In other words, financing agreements and ucc-l/financing statements automatically cover the secured party’s interest in the identifiable cash proceeds of the collateral, regardless of whether these writings expressly state that the security interest extends to proceeds.
 

 However, there is no ucc provision stating that a subordination agreement applicable to particular collateral automatically covers the proceeds of that collateral as well. Moreover, the UCC specifically states that a subordination agreement does not of itself constitute or create a security interest. MCL 440.1209; MSA 19.1209. Indeed, Article 9 of the ucc has little to say about the creation, interpretation, or enforcement of subordination agreements, other than the statement that “[n]othing in this article prevents subordination by agreement by any person entitled to . priority.” MCL 440.9316; MSA 19.9316. Professor .Hawk-land writes that “though the Code permits subordination agreements, it neither establishes the rules governing them nor speaks to the issues surrounding them.” Hawkland, § 9-316:1, p 380.
 

 The UCC expressly provides that the principles of law and equity shall supplement the ucc’s provisions unless displaced by the ucc’s particular provisions. MCL 440.1103; MSA 19.1103. Therefore, in the absence of any directly controlling UCC provisions, we resolve questions concerning the scope and effect of subordination agreements according to general legal principles, here, the law of contract inteipretation. See also Hawkland, § 9-316:1, pp 391-393, stating that questions concerning the effect of subordination agreements “are determined largely on the basis of
 
 *132
 
 non-Code rules . We therefore consider the rules of contractual interpretation to answer the question: When Farmers subordinated its security interest in 294 acres of beans to Conagra, did it also subordinate its interest in the proceeds of the beans?
 

 The primary goal of contract interpretation is to honor the intent of the parties.
 
 UAW-GM Human Resource Center v KSL Recreation Corp,
 
 228 Mich App 486, 491; 579 NW2d 411 (1998). If the contract language is clear and unambiguous, then its meaning is a question of law for the court to decide.
 
 Id.
 
 “As a general rule, where terms having a definite legal meaning are used in a written contract, the parties to the contract are presumed to have intended such terms to have their proper legal meaning, absent a contrary intention appearing in the instrument.”
 
 Nationwide Mut Fire Ins Co v Detroit Edison Co,
 
 95 Mich App 62, 64; 289 NW2d 879 (1980); 17A Am Jur 2d, Contracts, § 362, pp 384-385.
 

 Here, the term “security interest” has a particular legal meaning. Subsection 9-306(2) provides that a creditor’s security interest in collateral carries with it a security interest in the proceeds of that collateral. Accordingly, Farmers’ security interest in the beans carried with it a security interest in proceeds of the beans, including government disaster relief paid upon the destruction of the bean crop. Giving the term “security interest” its proper legal meaning, the statement in the subordination agreement that Farmers was subordinating to Conagra its “security interest” (or “secured interest”) in 294 acres of beans means that Farmers was also subordinating its interest in the
 
 *133
 
 proceeds.
 
 [11]
 
 Nothing in the subordination agreement evinces that the parties had a contrary intent. Indeed, the subordination agreement would have little value for Conagra if it did not apply to the proceeds of the beans. Obviously, both Farmers and Conagra understood that the Brennans were raising a bean crop with the purpose of selling the beans on the market. If Farmers retained its superior interest in the proceeds of the beans, then Conagra’s loan would have ceased to be secured once the Brennans exchanged the beans for value. On these facts, the most reasonable inference is that the parties intended for Conagra to take a superior interest in the proceeds.
 

 Interestingly, although Farmers’ position on this matter has not been entirely consistent, Farmers has at least implicitly conceded that the subordination agreement would have given Conagra a superior interest in a cash payment for the beans. On one hand, Farmers argues in its appellate brief that plaintiff would not have an interest in proceeds
 
 of any kind
 
 because the subordination agreement did not specify proceeds. On the other hand, Fanners’ counsel conceded during oral argument that the subordination agreement would have protected plaintiff’s interest in
 
 *134
 
 payment from a sale of the beans. Farmers has attempted to differentiate between sale proceeds and government disaster proceeds by insisting that Conagra could have no right to the latter without first receiving an assignment of the checks. Here, we have held that the government payments are indeed proceeds, and we find no basis for Farmers’ argument that Conagra forfeited its right to government disaster proceeds by failing to seek an assignment.
 
 [12]
 

 We therefore hold that the parties’ subordination agreement subordinated Farmers’ interest in the proceeds of the beans to Conagra. Because we have already concluded, as a matter of law, that the government disaster payments were proceeds, we conclude that Farmers violated Conagra’s rights by accepting assignment of those payments.
 

 D. HOLDER IN DUE COURSE
 

 Alternatively, Farmers argues that Conagra cannot assert any interest in the government disaster payments because Farmers is a holder in due course of the government-issued checks. We disagree.
 

 Farmers claims that it is a bona fide holder in due course of the checks issued by the United States Department of Agriculture. If Farmers were indeed a holder in due course of the checks, Farmers would take priority over any other security interest, even if that interest was perfected. MCL 440.9309; MSA 19.9309. This section provided at the time relevant to this action:
 

 
 *135
 
 Nothing in this article limits the rights of a holder in due course of a negotiable instrument (section 3302) or a holder to whom a negotiable document of title has been duly negotiated (section 7501) or a bona fide purchaser of a security (section 8302) and such holders or purchasers take priority over an earlier security interest even though perfected. Filing under this article does not constitute notice of the security interest to such holders or purchasers.
 

 The official comment to UCC 9-309 further clarifies the rights of a holder in due course:
 

 The operation of this section can be seen when two secured parties have a perfected security interest in an account, chattel paper, or general intangible and the secured party that does not have priority receives a payment by check directly or indirectly from the account debtor. If the recipient takes the check under circumstances that give the recipient the rights of a holder in due course (Section 3-302), then the recipient’s security interest in the check will take priority over the competing security interest and the recipient will be entitled to keep the payment. [Comment 3.]
 

 MCL 440.3302; MSA 19.3302 defines “holder in due course” and some of the rights associated with this status:
 

 (1) Subject to subsection (3) and section 3106(4), “holder in due course” means the holder of an instrument if both of the following apply:
 

 (a) The instrument when issued or negotiated to the holder does not bear such apparent evidence of forgery or alteration or is not otherwise so irregular or incomplete as to call into question its authenticity.
 

 (b) The holder took the instrument (i)
 
 for value,
 
 (ii)
 
 in good faith,
 
 (iii) without notice that the instrument is overdue or has been dishonored or that there is an incurred default with respect to payment of another instrument issued as part of the same series, (iv) without notice that
 
 *136
 
 the instrument contains an unauthorized, signature or has been altered, (v)
 
 without notice of any claim to the instrument described in section 3306,
 
 and (vi) without notice that any party has a defense or claim in recoupment described in section 3305(1).
 

 (2) Notice of discharge of a party, other than discharge in an insolvency proceeding, is not notice of a defense under subsection (1), but discharge is effective against a person who became a holder in due course with notice of the discharge. Public filing or recording of a document does not of itself constitute notice of a defense, claim in recoupment, or claim to the instrument.
 

 (3) Except to the extent a transferor or predecessor in interest has rights as a holder in due course, a person does not acquire rights of a holder in due course of an instrument taken (i) by legal process or by purchase in an execution, bankruptcy, or creditor’s sale or similar proceeding, (ii) by purchase as part of a bulk transaction not in ordinary course of business of the transferor, or (iii) as the successor in interest to an estate or other organization.
 

 (4) If under section 3303(l)(a) the promise of performance that is the consideration for an instrument has been partially performed, the holder may assert rights as a holder in due course of the instrument only to the fraction of the amount payable under the instrument equal to the value of the partial performance divided by the value of the promised performance.
 

 (5) If (i) the person entitled to enforce an instrument has only a security interest in the instrument and (ii) the person obliged to pay the instrument has a defense, claim in recoupment, or claim to the instrument that may be asserted against the person who granted the security interest, the person entitled to enforce the instrument may assert rights as a holder in due course only to an amount payable under the instrument which, at the time of enforcement of the instrument, does not exceed the amount of the unpaid obligation secured.
 

 (6) To be effective, notice must be received at a time and in a manner that gives a reasonable opportunity to act on it.
 

 
 *137
 
 (7) This section is subject to any law limiting status as a holder in due course in particular classes of transactions. [Emphasis added.]
 

 A person gives value for an instrument when
 

 [t]he instrument is issued or transferred as payment of, or as security for, an antecedent claim against any person, whether or not the claim is due. [MCL 440.3303(l)(c); MSA 19.3303(l)(c).]
 

 The official comment to UCC 3-306 indicates that a party wishing to gain the status of a holder in due course must not be aware of the following claims at the time of the transfer:
 

 [N]ot only claims to ownership but also any other claim of. a property or possessory right. It includes the claim to a lien or the claim of a person in rightful possession of an instrument who was wrongfully deprived of possession. Also included is a claim based on Section 3-202(b) for rescission of a negotiation of the instrument by the claimant.
 

 Here, if Farmers could satisfy the requirements for a holder in due course, MCL 440.3302; MSA 19.3302, Farmers would have a superior right to the disaster payments under MCL 440.9309; MSA 19.9309. Under the definition of value in MCL 440.3303; MSA 19.3303, it seems clear that Farmers gave value for the government checks, because the Brennans granted rights in the disaster money checks as payment of their debt to Farmers. The more pertinent question here is whether Farmers can meet the other requirements of a holder in due course, namely, taking the check in good faith and without notice of Conagra’s claim to the disaster money through their security interest in
 
 *138
 
 the bean crop. MCL 440.3302(l)(b); MSA 19.3302(l)(b).
 

 Farmers cannot claim that it took the disaster checks without notice of Conagra’s claim to the money. Tim Miller, Farmers’ loan officer and vice president, testified during his deposition in response to questions asked by plaintiff’s counsel that he was fully aware of Conagra’s claim to both the bean crop described in the parties’ subordination agreement and the proceeds:
 

 Q:
 
 Tira, you knew that Farmers had a security agreement and a first lien on the crops?
 

 A:
 
 Yes.
 

 Q:
 
 You knew that Berger [Conagra] wanted some sort of first lien on a portion of the crops; is that correct?
 

 A:
 
 Yes. Subordination. Not a lien, but a subordination.
 

 Q:
 
 Isn’t it correct that for the first $80,000 in payments relating to the dry bean crop, your understanding is — is that Berger would have a first claim on that money for the beans, the first $80,000?
 

 A:
 
 Of the 294 acres of dry beans, yes.
 

 Q:
 
 Okay. So, that was discussed with Frank, correct?
 

 A:
 
 Yes.
 

 Q:
 
 Okay. And this—this first interest that Berger would have on the 294 acres of dry beans, on those proceeds —
 

 A:
 
 Yes.
 

 Q:
 
 — what was the interest that Berger was getting? Was it similar to what Farmers was subordinating? Was it a secured interest?
 

 A: Berger was getting our subordination to those 200
 
 —
 
 the proceeds off those 294 acres of dry beans.
 

 Q:
 
 Well, the way I understood it, then, is, on the 294 acres of beans, up to $80,000, Berger came first as to the claim to those payments, right?
 

 
 *139
 

 A:
 
 Yes.
 

 Q:
 
 When those proceeds came in, those were supposed to be reserved or forwarded to Berger; is that right?
 

 A:
 
 The dry beans, yes.
 

 Mr. Miller also testified that he knew that some of the money contained in the disaster relief payments Farmers had been assigned by the Brennans included money for the loss of the bean crop in which Conagra held a security interest before Farmers’ receipt of the government checks:
 

 Q:
 
 All right. So you mentioned this to Frank about the assignment. Frank is not able to get the assignment. That’s in 1994. Then in 1995 when did you first have some indication or become aware that there might be disaster payments paid to the Brennans for which Farmers had an assignment, when did that first come to your attention that that might be coming?
 

 A:
 
 I would guess October ‘94.
 

 Q:
 
 When it was assigned to you?
 

 A:
 
 Correct.
 

 Q:
 
 So really when the Brennans assigned the disaster payments in October 1994 they had had some problems with their beans and it was quite evident there would be some payment for that assignment, on that assignment, you were anticipating that?
 

 A:
 
 You’re saying just beans. They had problems with beans, cucumbers and beets and was I aware of that, yes.
 

 This testimony, coupled with the fact that Farmers is a sophisticated creditor, leads us to conclude that Farmers had knowledge of Conagra’s claim to at least a portion of the government disaster relief money.
 

 Farmers cites
 
 Allstate Financial Corp v Financorp, Inc,
 
 934 F2d 55 (CA 4, 1991), in support of its position. There, the court held that Financorp, whose lien on the debtor’s accounts receivable was junior to All
 
 *140
 
 state’s lien on the same accounts receivable, nonetheless had a superior interest in checks paid to the debtor’s accounts receivable and indorsed over to Financorp.
 
 Id.,
 
 57-59. The court’s decision was based on Allstate’s failure to show that Flnancoip had constructive knowledge of Allstate’s prior lien.
 
 Id.,
 
 59. In contrast, here Conagra has shown that Farmers had knowledge of Conagra’s interest in the bean crop and proceeds. Here, we do not have merely a junior and senior lienholder with no prior agreement or knowledge of each other, but rather two parties to a subordination agreement that reserved for Conagra a superior interest in a specific portion of the debtors’ assets. Accordingly,
 
 Financorp
 
 is distinguishable. Therefore, Farmers is unable to satisfy the elements to gain the status of a holder in due course as described under § 3-302.
 

 E. ESTOPPEL
 

 Finally, we reject Farmers’ argument that the doctrine of equitable estoppel bars plaintiff’s claim to the government disaster payments. First, we note that this issue is not properly before this Court. In the absence of a cross appeal, Farmers, as appellee, is precluded from arguing that the trial court should have, or could have, dismissed plaintiff’s claim on the basis of Farmers’ equitable estoppel theory. Although Farmers filed a cross appeal to preserve its holder in due course issue, it failed to similarly preserve its estoppel issue.
 

 Furthermore, Farmers has failed to satisfy the elements for application of the equitable estoppel doctrine. Equitable estoppel is not an independent cause of action, but instead a doctrine that may assist a
 
 *141
 
 party by precluding the opposing party from asserting or denying the existence of a particular fact.
 
 West American Ins Co v Meridian Mut Ins Co,
 
 230 Mich App 305, 309-310; 583 NW2d 548 (1998). Equitable estoppel may arise where (1) a party, by representations, admissions, or silence intentionally or negligently induces another party to believe facts, (2) the other party justifiably relies and acts on that belief, and (3) the other party is prejudiced if the first party is allowed to deny the existence of those facts.
 
 Id.,
 
 310. Here, Farmers’ equitable estoppel theory is predicated on plaintiff’s alleged failure to inform Farmers that it believed that the government payments included proceeds of the bean crop and alleged failure to obtain an assignment of the payments from the Brennans. Silence or inaction may form the basis for an equitable estoppel only where the silent party had a duty or obligation to speak or take action.
 
 Id.
 
 Farmers has failed to show that plaintiff had a duty to take such action. Moreover, because Farmers was a party to the subordination agreement, there is no reason why Conagra should have a duty to inform Farmers of Conagra’s rights under that contract.
 

 IV. CONCLUSION
 

 We conclude, as a matter of law, that the government payments are proceeds of the bean crop within the meaning of § 9-306 and that the subordination agreement protected Conagra’s interest in those proceeds. We remand for the trial court to determine what portion of the government disaster payments is attributable to the loss of the bean crop. Finally, we reject Farmers’ arguments that it is a holder in due
 
 *142
 
 course of the government checks and that Conagra’s conversion claim is barred by estoppel.
 

 The order of summary disposition is reversed and the mater is remanded for further proceedings in accordance with this opinion. We do not retain jurisdiction.
 

 [1]
 

 The Brennans were codefendants in the trial court. The trial court dismissed plaintiff’s claims against the Brennans pursuant to a stipulation to dismiss.
 

 [2]
 

 The parties explained during oral argument that the acreage described was actually more than 294 acres, because a portion of the bean crop was designated to another person under a sharecropping arrangement.
 

 [3]
 

 Defendant’s request is dated October 10, 1994. Plaintiff has erroneously stated that the request was made February 10, 1994.
 

 [4]
 

 Plaintiff has apparently abandoned this claim on appeal.
 

 [5]
 

 Presumably, plaintiff’s summary disposition motion was based on both the breach of contract claim and the conversion claim against Fanners.
 

 [6]
 

 Nivens
 
 also discussed government relief for low yields and drops in market value, neither of which is at issue here.
 

 [7]
 

 Although we are confident that the
 
 Schmaling
 
 analysis provides a sound approach for resolving the specific issue presented to us, we acknowledge that this is a highly controversial area of ucc law, marked by divergent opinions and theories applied to a large panoply of factual situations. See anno:
 
 Secured transactions: Government agricultural program payments as “proceeds” of agricultural products under UCC § 9-306,
 
 79 ALR4th 903; Comment,
 
 Bankruptcy, the ucc, and the farmer: Pik payments—Heads “general intangibles," Tails “proceeds,"
 
 26 Washburn LJ 178 (1986); Note,
 
 Agricultural financing through production payments: Planning for protection of farmer and lender,
 
 34 Drake L R 515 (1984-85). For example, not all courts have required disposition of an existing commodity as a condition for finding that a pik subsidy was proceeds. See
 
 In re Hollie,
 
 42 Bankr 111 (MD Ga, 1984) (milk that dairy farmer received through participation in pik program qualified as proceeds because it was a substitute for milk the farmer
 
 would have
 
 produced). A similar controversy broils over government relief for low-yield crops (i.e., where the
 
 *126
 
 government compensates the farmer for a crop that was not destroyed, but that produced a smaller than normal yield). See
 
 Nivens, supra,
 
 and
 
 Ladd, supra,
 
 reaching conflicting conclusions regarding this issue. We therefore limit our analysis to the government disaster relief payment the Brennans received, without expressing an opinion with respect to the myriad of other government agricultural subsidy programs.
 

 [8]
 

 Subsection 9-306(4), MCL 440.9306(4); MSA 19.9306(4) provides detailed rules for identifying cash proceeds in the context of insolvency proceedings, which is not the case here.
 

 [9]
 

 During oral argument, Farmers elaborated on this argument by pointing out that plaintiff’s security interest applied to only 294 acres out of a much larger bean planting, and that the government payments did not
 
 *130
 
 specify which part of the payment applied to those acres. Because this issue was not raised before oral argument, we conclude that it has been waived.
 
 Cox v
 
 D’Addario, 225 Mich App 113, 130; 570 NW2d 284 (1997).
 

 [10]
 

 The courts in
 
 In re Kors, Inc,
 
 64 Bankr 163 (D Vt, 1986), and
 
 Orix Credit Alliance, Inc v Sovran Bank, NA,
 
 4 F3d 1262 (CA 4, 1993), both assumed that the subordination agreement in question covered proceeds. However, because these courts made this assumption without an articulated analysis, they are of limited precedential value.
 

 [11]
 

 For a conflicting analysis of this issue, see Chief Judge Ervin’s dissent in Oria;
 
 Credit,
 
 n 10
 
 supra,
 
 which rejected the majority's assumption that the subordination agreement covered proceeds. Instead, Chief Judge Ervin opined that the subordination agreement “serves effectively to bind the parties in a contractual system of priorities outside the scope of Article 9” and that the parties’ rights “emanate solely from within the four comers of the subordination agreement.”
 
 Id.,
 
 1270. Chief Judge Ervin would have remanded to the trial court for findings of fact regarding this question.
 
 Id.,
 
 1272. While we agree with Chief Judge Ervin that subordination agreements should be interpreted by general contract law principles, we find his analysis flawed for failing to interpret the term “security interest” according to its established legal meaning. 17A Am Jur 2d, Contracts, § 362, pp 384-385.
 

 [12]
 

 Furthermore, Farmers maintains on appeal that the trial court reached the correct result for the correct reason, which suggests acquiescence to the trial court’s finding that the agreement applied to proceeds.