*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

KENWAL PICKLING, LLC,

    Plaintiff/Counterdefendant-Appellee,

v

PVS TECHNOLOGIES, INC.,

    Defendant/Counterplaintiff-Appellant.

UNPUBLISHED
April 21, 2022

No. 354506
Wayne Circuit Court
LC No. 17-017145-CB

Before: LETICA, P.J., and REDFORD and RICK, JJ.

PER CURIAM.

In this action for breach of contract, defendant/counterplaintiff, PVS Technologies, Inc. (PVS), appeals as of right the trial court's judgment in favor of plaintiff/counterdefendant, Kenwal Pickling, LLC (Kenwal). We affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

This case arises from a contract dispute between Kenwal and PVS. Kenwal is a steel-processing company that "pickles" steel for its customers in the automotive, electronics, appliance, and other major equipment industries. "Pickling is the process in which steel coils are uncoiled and rolled through several [hydrochloric acid (HCl)] acid-solution pickle baths to remove impurities on the surface of the steel." The steel is then given a protective oil coating. PVS is a chemical supply company, and it did not manufacture the HCl purchased by Kenwal. Rather, PVS had a "keep dry" agreement with PPG/Barberton (PPG). PPG manufactured chloroformate, and, in the manufacturing process, the company produced 20-degree HCl as a by-product. PVS agreed to "keep dry" the HCl for PPG. Specifically, PVS removed the HCl from PPG's premises so it could continue to manufacture chloroformate. PVS took the HCl and supplied it to Kenwal. After Kenwal "pickled" the steel in the acid solution bath, the remaining "pickle liquor" created a chemical by-product of the steel pickling process, known as ferrous chloride ($FeCl_2$). PVS removed the $FeCl_2$ from Kenwal's premises and provided it to municipalities for water treatment purposes.

-1-

Beginning in 2006, Kenwal and PVS agreed to a series of requirements contracts for the purchase of all the 20-degree HCl[1] that Kenwal required and sale of all the FeCl2 that Kenwal produced during the pickling process. In August 2015, PVS and Kenwal entered into a contract for 20-degree HCl and FeCl2, and this contract was to expire on December 31, 2017 (the 2015 contract). In the one-page 2015 contract, PVS agreed to supply 100% of Kenwal's 20-degree HCl requirements at $166 per ton, which could "increase not more than $10/ton" in 2016 and 2017, and purchase 100% of Kenwal's FeCl2 production for two-cents per gallon. In addition, the 2015 contract stated PVS's pricing was premised on PVS being awarded the business for both items, meaning the 20-degree HCl and FeCl2.

During the parties' business relationship, Kenwal experienced a "periodic" copper-plating issue, which resulted in copper stains and discoloration of Kenwal's steel after the pickling process. This copper-plating did not affect the integrity of the steel. However, the copper stains on the steel caused Kenwal to lose business and discouraged Kenwal from pickling other types of steel. Thus, Kenwal was limited from taking on new business. Despite efforts to identify the cause of the copper-plating issue, Kenwal managed the issue by adding fresh HCl to its pickling baths. In December 2015, John DuBrock replaced Kenwal's vice president of operations, Larry Bogner.[2] From DuBrock's previous experience in the steel pickling industry, he believed using a higher concentrated 22-degree HCl, instead of 20-degree HCl, would eliminate Kenwal's copper-plating issue. DuBrock thought the cost of 22-degree HCl would be more than 20-degree HCl because of the higher concentration. However, he obtained quotes from suppliers that were lower than the price Kenwal was paying for 20-degree HCl under the 2015 contract.

In February 2016, Kenwal notified PVS of its desire to purchase 22-degree HCl, instead of 20-degree HCl. During a series of meetings, PVS's representatives told DuBrock that "PVS had a contract with Kenwal." In response, DuBrock advised PVS that he "wasn't so sure they had a contract for 22-degree HCL," and that PVS's pricing for 20-degree HCl was an "embarrassment[.]" However, Kenwal's and PVS's chief executive officers, Kenneth Eisenberg and James Nicholson, respectively, ultimately agreed to supply 22-degree HCl. Nicholson instructed Lauren Kovaleski, PVS's President, to finalize a new agreement with Kenwal. Because Kovaleski did not want to risk losing Kenwal's business, she did not, nor did any other PVS employee, tell Kenwal that PVS was negotiating under protest or with a reservation of rights. In April 2016, PVS sent Kenwal a proposed agreement (the 2016 contract), which stated PVS would sell 22-degree HCl to Kenwal for $80 per ton and purchase Kenwal's FeCl2 for five-cents per gallon. The 2016 contract also stated: "This new Agreement supersedes all previous agreements." In May 2016, DuBrock signed the 2016 contract and sent it back to PVS.

---

[1] Specifically, 22-degree HCl, which is comprised of 64% water and 36% HCl, is slightly more concentrated than 20-degree HCl, which is comprised of 68% water and 32% HCl.

[2] In 2008, Bogner asked PVS's sales manager, Jim Bennett, to check for metal copper in the acid supplied by PVS. No copper was detected in the supplied product. Ultimately, Bogner proposed the installation of an ion exchange unit as a possible solution to the copper-plating problem. The proposal was rejected by management of Kenwal in light of the product and installation costs and yearly operating expense.

A representative of PVS did not sign the 2016 contract. Nonetheless, the parties began to perform under the 2016 contract. PVS employees were instructed regarding the new contractual rates and that a fuel surcharge did not apply to the 2016 contract. In April 2017, PVS informed Kenwal the price of 22-degree HCl would be increased to $90 per ton as permitted in the 2016 contract.

The parties performed under the 2016 contract until July 2017. In July 2017, the market price for HCl increased, and PVS's representatives informed Kenwal, over Kenwal's objection, that the price for 22-degree HCl would be immediately increased to $160 per ton. In September 2017, PVS informed Kenwal the price of 22-degree HCl would again be increased in accordance with the 2015 contract, and not the 2016 contract, to $166 per ton. Additionally, PVS stated it would only pay Kenwal two-cents per gallon for FeCl2, instead of five-cents per gallon, and the parties' agreement would expire on December 31, 2017, as indicated in the 2015 contract. Kenwal agreed to the price increase "under protest[,]"stating it "would reserve [its] rights" to overpaying PVS. In November 2017, PVS sent Kenwal a new agreement to supply Kenwal with 20-degree HCl, instead of 22-degree HCl, for $306 per ton; required Kenwal to purchase a minimum quantity; and contained a termination provision that only PVS was permitted to exercise. Kenwal continued to pay the increased price until it secured a new supplier.

Kenwal filed suit, alleging PVS breached the valid and enforceable 2016 contract by refusing to honor the agreed pricing and unilaterally demanding Kenwal revert to the terms of the superseded 2015 contract. PVS denied the allegations, asserting it did not breach the 2015 contract or the unenforceable 2016 contract, but rather, Kenwal's claims were barred because it breached the 2015 contract. In a counterclaim, PVS alleged Kenwal breached the valid and enforceable 2015 contract by coercing PVS to accept reduced payments for 22-degree HCl and increased prices for FeCl2, and threatening to cut off its purchase of HCl and sale of FeCl2 before the expiration date of the 2015 contract. The parties filed cross-motions for summary disposition, and the trial court denied the motions, concluding that summary disposition was improper in light of conflicting factual issues.

At the conclusion of a four-day bench trial, the trial court granted judgment in favor of Kenwal, concluding the 2016 contract was valid and binding because PVS performed the contract for nearly 15 months without objection. Specifically, the trial court determined "[t]here was no contractual right or basis for PVS to obtain a price increase from Kenwal" and, therefore, "PVS obtained a price increase over Kenwal's protest by first threatening to stop removing Kenwal's [FeCl2] . . ., and then threatening to only deliver 50% of Kenwal's HCl requirements." The trial court also concluded PVS breached the 2016 contract "by unilaterally changing its term from expiring on December 31, 2019 to December 31, 2017." Moreover, the trial court determined Kenwal did not coerce PVS into the 2016 contract or breach the 2015 contract, stating the 2016 contract was not a modification, but was "a new contract for a different product (22-degree HCl), with different pricing for both the HCl and FeCl2, no fuel surcharges, and a different contract period (March 1, 2016 through December 31, 2019, where the August 2015 contract expired December 31, 2017)." The trial court also reasoned the 2016 contract explicitly stated "in bold italics that '***This new Agreement supersedes all previous agreements***.' " Because PVS used the term "supersedes," instead of "modifies," the trial court concluded the 2016 contract replaced the 2015 contract. The trial court found Kenwal reasonably determined there was a legitimate business advantage to using 22-degree HCl, rather than 20-degree HCl, in light of DuBrock's years of

experience with this product and the fact that Kenwal's competitors used 22-degree HCl to eliminate its long-standing copper-plating problem. The trial court also noted PVS's expert, Matthew John Allen, Ph.D., testified that DuBrock's preference for 22-degree HCl to prevent copper-plating was reasonable given his prior steel pickling experience. Accordingly, the trial court concluded Kenwal "had a legitimate, good faith business [reason] to change products from 20-degree HCl to 22-degree HCl." Further, the trial court reasoned PVS had legal remedies available to it if it believed Kenwal's decision to switch products was unlawful, but PVS elected not to pursue any of these remedies under the Uniform Commercial Code (UCC). Accordingly, the trial court entered a judgment in Kenwal's favor on its claims against PVS and on PVS's counterclaim against Kenwal.

## II. STANDARDS OF REVIEW

"This Court reviews a trial court's factual findings in a bench trial for clear error, and reviews its conclusions of law de novo." *Trahey v Inkster*, 311 Mich App 582, 593; 876 NW2d 582 (2015). "A finding is clearly erroneous if there is no evidentiary support for it or if this Court is left with a definite and firm conviction that a mistake has been made." *Id*. (quotation marks and citation omitted). Likewise, this Court reviews questions of statutory and contract interpretation de novo. *Id*.; *Titan Ins Co v Hyten*, 491 Mich 547, 553; 817 NW2d 562 (2012). Specifically, courts will enforce contracts in accordance with their terms and give the words of the contract their plain and ordinary meanings. *Reicher v SET Enterprises, Inc*, 283 Mich App 657, 664; 770 NW2d 902 (2009). The unambiguous language of a contract is found to reflect the intent of the parties, as a matter of law, and will be enforced in accordance with its terms. *Id*.; *Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 51; 664 NW2d 776 (2003).

In general, Michigan's UCC, MCL 440.1101 *et seq*., applies to the sale of goods. MCL 440.2102. The UCC "is to be liberally construed and applied to promote its underlying purposes and policies." *Power Press Sales Co v MSI Battle Creek Stamping*, 238 Mich App 173, 180; 604 NW2d 772 (1999). In the absence of a directly controlling UCC provision, questions are resolved according to general legal principles, i.e., the law of contract interpretation. *Conagra, Inc v Farmers State Bank*, 237 Mich App 109, 131-132; 602 NW2d 390 (1999); MCL 440.1103.

## III. ANALYSIS

## A. 2015 CONTRACT

PVS alleges that the trial court erred in its legal and factual determinations because Kenwal breached the 2015 contract by unilaterally reducing its requirements for 20-degree HCl and the supply of FeCl2. We disagree.

Generally, a contract for the sale of goods requires that the contract specify a quantity. *MSSC, Inc v Airboss Flexible Prods Co*, ___ Mich App ___, ___; ___ NW2d ___ (2021) (Docket No. 354533) slip op at p 3. However, a requirements contract is one in which "the quantity term is not fixed at the time of contracting [and t]he parties agree that the quantity will be the buyer's needs or requirements of a specific commodity or service over the life of the contract." *Id*. at p 4, citing 13 Corbin, Contracts (rev ed), § 6.5, p 240 (quotations omitted). The UCC expressly recognizes the validity and enforceability of a requirements contract, despite ambiguity in the

stated quantity term, as long as the buyer's actual requirements are made in good faith. MCL 440.2306(1). Likewise, MCL 400.1304 imposes an obligation of "good faith" in performance and enforcement of the contract on the parties. "Good faith" is generally defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing." MCL 440.1201(2)(t).

Under a requirements contract, the parties are expected to act "in good faith and according to commercial standards of fair dealing in the trade." *Gen Motors Corp v Paramount Metal Prods Co*, 90 F Supp 2d 861, 873 (ED Mich, 2000), citing MCL 440.2306, official comment 2 (1964) (quotation marks omitted).[3] A party may be subject to liability for breach of contract if it acts in bad faith or seeks to unilaterally terminate the contract. *Id*. at 873. However, "a buyer does not breach a requirements contract by setting its requirements to zero—so long as zero is the buyer's good-faith requirement." *Silver Foam Distrib Co v Labatt Brewing Trading Co, Ltd*, ___ F Supp 2d ___, ___ (ED Mich, 2021) (Docket No. 20-10681); slip op at 6. A buyer acts in good faith "if it had a business reason for deciding [to reduce its requirements] that was independent of the terms of the contract or any other aspects of its relationship with [the seller]." *Id*. at ___; slip op at 7 (quotation marks and citation omitted).

The trial court did not err in concluding Kenwal did not breach the 2015 contract. It is undisputed that PVS and Kenwal performed without incident under previous requirements contracts and the 2015 contract for 20-degree HCl until February 2016. Over the parties' business relationship, Kenwal experienced copper-plating issues with its steel, which it spent time and resources trying to resolve. Bogner discussed the issue with Bennett such that PVS was more than aware of Kenwal's problem and PVS agreed to test the 20-degree HCl, at Kenwal's request, to determine whether copper was present in the HCl. Notably, Bennett, shared an article with Bogner regarding another steel company's experience with copper-plating problems to assist Kenwal. While it appears Bogner found a resolution, in 2011, if Kenwal purchased and installed an ion exchange unit, Kenwal's management decided not to pursue this option because of the significant installation and operation costs. Instead, Kenwal implemented a process of flushing and refreshing its pickling tanks with new HCl to minimize periodic copper-plating issues. When Kenwal hired DuBrock, in late 2015, DuBrock suggested switching to 22-degree HCl to eliminate the copper-plating issue on the basis of his extensive experience in the steeling pickling industry and lack of copper-plating issues with 22-degree HCl. Because 22-degree HCl is more concentrated than 20-degree HCl, DuBrock anticipated the cost of 22-degree HCl would be greater than 20-degree HCl but would eliminate Kenwal's copper-plating issue.

The parties disputed the relevancy and the motivation of the copper-plating issue because it did not affect the integrity of the steel and was not threatening to put Kenwal out of business or into bankruptcy. Nonetheless, the trial court evaluated the credibility of the witness testimony pertaining to this issue and found that it served as a valid ground to end Kenwal's purchase of 20-degree HCl and justified the switch to 22-degree HCl. The trial court, in this bench trial, served as the fact-finder, and we review the factual findings for clear error and conclusions of law de

---

[3] While this Court is not bound by a decision of a federal court, federal court decisions may be persuasive. *Abela v Gen Motors Corp*, 469 Mich 603, 606-607; 677 NW2d 325 (2004).

novo. *Patel v Patel*, 324 Mich App 631, 633; 922 NW2d 647 (2018). We also defer to the trial court's superior ability to judge the credibility of the witnesses that appeared before it. *Id.* In light of the trial court's factual findings and credibility determinations, the trial court was entitled to conclude that Kenwal had a legitimate business purpose to eliminate its use of 20-degree HCl and negotiate a contract for 22-degree HCl. The fact that there was a financial benefit if Kenwal switched to 22-degree HCl did not the alter the finding rendered by the trial court pertaining to copper-plating and quality issues. Therefore, the trial court did not err in finding Kenwal acted in good faith by reducing its requirements for 20-degree HCl to zero to switch to 22-degree HCl.[4]

Regardless of Kenwal's HCl requirements, PVS submits Kenwal breached the 2015 contract by its bad-faith demand PVS pay a higher price for Kenwal's FeCl2. Specifically, PVS contends Kenwal did not identify a legitimate business reason for this contractual change. However, a review of the contracts indicates Kenwal's purchase of 20-degree HCl and PVS's purchase of FeCl2 were always dependent on each other's performance. In fact, PVS drafted the 2015 contract to explicitly state: "Our pricing is based on PVS Chemicals being awarded the business on both of these items[.]" Further, the record supports the HCl and FeCl2 requirements constituted an "integrated proposal," and the sale of one was dependent on the purchase of the other. On this basis, as the trial court stated, when Kenwal reduced its requirements to zero for 20-degree HCl, "the 2015 agreement effectively ended." As a result, there was no obligation to sell FeCl2 to PVS at that point. Therefore, the trial court did not err in finding Kenwal did not breach the 2015 contract with regard to the FeCl2.

Further, we note if PVS believed Kenwal was unlawfully attempting to avoid the 2015 contract, it should have pursued the remedies available to it under the UCC at that time. "A party that with explicit reservation of rights performs or promises performance or assents to performance in a manner demanded or offered by the other party does not prejudice the rights reserved by that performance, promise, or assent." MCL 440.1308(1). The statute allows for "limited as well as general reservations and acceptance" by a party, stating "[w]ords such as 'without prejudice', 'under protest', or the like are sufficient." MCL 440.1308(1); MCL 440.1308, official comment 1 (2013). While PVS was not required to use specific language to reserve its rights, the record does not indicate PVS made even a general reservation. Specifically, there is no indication that PVS intended to enter into the 2016 contract under protest. Rather, Bennett and Steffi Korte[5] merely told Kenwal that "PVS had a contract with Kenwal." We note that although PVS characterizes Kenwal's actions by DuBrock as extortion, ultimately the corporate executives Eisenberg and Nicholson met to resolve the issue regarding the concentration of HCl and the price. The resulting agreement reflected a negotiation among longtime business associates. Ultimately,

---

[4] PVS contends that the trial court clearly erred in its factual findings. However, PVS's summation of the witness testimony is contrary to MCR 7.212(C)(6) because it fails to delineate all "material facts, both favorable and unfavorable" stated without argument or bias. For example, although Dr. Allen testified to the concentration and dilution of HCl, he acknowledged a lack of experience or expertise in the pickling process.

[5] Korte is the sales director of PVS Chloralkali, PVS's sister company.

Eisenberg did not obtain the cheapest rate that he could acquire through a new supplier of $70 per ton.

After the meeting between Eisenberg and Nicholson, the formality of the terms was tasked to Kovaleski and DuBrock. Kovaleski explicitly did not tell DuBrock that PVS was negotiating under protest or with a reservation of rights because she did not want to lose Kenwal's business. On this basis, there is a lack of evidence to support PVS's argument that it entered the 2016 contract under protest. Moreover, in light of the corporate meeting that negotiated a resolution to the dispute, the claim of extortion is not supported. Even to the extent such evidence[6] exists, there is no dispute that PVS performed under the 2016 contract for 15 months, without objection or pursuing damages for Kenwal's alleged coercion. Therefore, the trial court did not err in finding PVS failed to protest Kenwal's bad-faith breach of the 2015 contract.

## B. 2016 CONTRACT

PVS asserts the trial court erred in concluding PVS breached the valid and enforceable 2016 contract. We disagree.

"The primary goal in the construction and interpretation of any contract is to honor the intent of the parties." *UAW-GM Human Resource Ctr v KSL Recreation Corp*, 228 Mich App 486, 491; 579 NW2d 411 (1998) (quotation marks and citation omitted). "Th[e appellate] court does not have the right to make a different contract for the parties or to look to extrinsic testimony to determine their intent when the words used by them are clear and unambiguous and have a definite meaning." *Id*. (quotation marks and citation omitted). Moreover, "parties to a contract are not forever locked into its terms." *Archambo v Lawyers Title Ins Co*, 466 Mich 402, 412; 646 NW2d 170 (2002) (citation omitted). Rather, the parties "are at all times free to alter, amend, or modify their agreement." *Id*. (citation omitted). Although the parties to a contract are free to mutually modify their contract, "the principle of freedom to contract does not permit a party *unilaterally* to alter the original contract." *Quality Prods & Concepts Co v Nagel Precision, Inc*, 469 Mich 362, 364; 666 NW2d 251 (2003). "Moreover, the parties may execute a substituted agreement which totally supersedes the terms of the original[,]" i.e., a novation. *Archambo*, 466 Mich at 412-413. (citation omitted). To establish a novation, a party must show (1) the parties are capable of contracting; (2) there is a valid prior obligation to be displaced; (3) the consent of all parties to the substitution from sufficient consideration; and (4) the extinction of the old obligation and the creation of a valid new one. *Macklin v Brown*, 111 Mich App 110, 112; 314 NW2d 538 (1981).[7]

The trial court did not err in concluding the 2016 contract was an enforceable contract against PVS. A review of the record indicates the 2016 contract was a new agreement and novation

---

[6] Although we acknowledge that Eisenberg and Nicholson's characterization of the tone of the meeting differed, the trial court did not make a credibility determination in Nicholson's favor, and we defer to the trial court's assessment. *Patel*, 324 Mich App at 633.

[7] Opinions from this Court that predate November 1, 1990, are not precedentially binding on this Court in accordance with MCR 7.215(J)(1), but can be persuasive. *In re Stillwell Trust*, 299 Mich App 289, 299 n 1; 829 NW2d 353 (2013).

of the 2015 contract, and not a modification of the 2015 contract as argued by PVS. There is no dispute the parties have a long history of being capable of contracting for HCl. A comparison of the 2015 contract and the 2016 contract indicates the parties' intended to discontinue the purchase and supply of 20-degree HCl with 22-degree HCl, and to extend the expiration date of the 2016 contract to December 31, 2019. Moreover, "[u]pon proof of an express oral or written agreement, the mutuality requirement is clearly satisfied." *Quality Prods and Concepts Co*, 469 Mich at 373. Because PVS and Kenwal reduced the 2016 contract to writing, the mutuality requirement for a novation was satisfied. *Id.* PVS also arguably accepted the 2016 contract by performing under the contract for 15 months. *DaimlerChrysler Corp v Wesco Distrib, Inc*, 281 Mich App 240, 247; 760 NW2d 828 (2008).

In addition, PVS contends the 2016 contract was merely a modification of the 2015 contract because there is no significant difference between 22-degree HCl and 20-degree HCl; however, PVS's argument is without merit. Rather, the parties' course of conduct and previous contracts indicate PVS was supplying two distinct products, i.e., 20-degree HCl and 22-degree HCl, that had different compositions, prices, and terms. Specifically, the 2016 contract states PVS will supply and deliver 22-degree HCl at $80 per ton, and purchase Kenwal's $FeCl_2$ for five-cents per gallon if the iron content in the $FeCl_2$ is "greater than or equal to 8%." Conversely, the 2015 contract states PVS will supply 20-degree HCl at $166 per ton, and purchase Kenwal's $FeCl_2$ for two-cents a gallon if the "strength as $FeCl_2$" is greater than or equal to 28%. Moreover, the fact that PVS drafted the 2015 contract and 2016 contract for 20-degree HCl and 22-degree HCl, respectively, and not for HCl, in general, indicates the parties considered these products to be distinct from one another.

Further, the 2016 contract contains an explicit statement of intent to abrogate all previous contracts, including the 2015 contract, by stating: "This new Agreement supersedes all previous agreements." Because "an integration clause nullifies all antecedent agreements," the 2016 contract supersedes and operates to abrogate the 2015 contract. *UAW-GM Human Resource Ctr*, 228 Mich App at 499. Accordingly, the pricing and expiration date terms contained within the 2015 contract did not govern the parties HCl and $FeCl_2$ transactions after the parties entered into the 2016 contract. On this basis, the trial court properly concluded the 2016 contract was a valid and binding novation of the 2015 contract. As a result, PVS's reliance on *Roth Steel Prods v Sharon Steel Corp*, 705 F 2d 134 (CA 6, 1983), was misplaced because it did not address a novation, but a modification of an existing contract. Because PVS unilaterally increased the price of 22-degree HCl, in November 2017, beyond the terms of the 2016 contract, PVS breached the 2016 contract. Therefore, the trial court properly concluded PVS breached the valid and enforceable 2016 contract.

Affirmed. Kenwal, as the prevailing party, may tax costs.

/s/ Anica Letica
/s/ James Robert Redford
/s/ Michelle M. Rick